**Ricardo ORTIZ, Appellant,**

v.

**The STATE of Texas.**

**No. 73692.**

Court of Criminal Appeals of Texas,
En banc.

Sept. 25, 2002.

Rehearing Denied Nov. 13, 2002.

James D. Jucas, El Paso, for appellant.

Richard B. Dulany, Assist. DA, El Paso, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

KEASLER, J., delivered the unanimous opinion of the Court.

Ricardo Ortiz was convicted of capital murder by committing murder in the course of retaliation or attempted retaliation.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, Articles 37.071 §§ 2(b) and 2(e),[2] the trial judge sentenced appellant to death.[3] Direct appeal to this Court is automatic.[4] Ortiz raises thirteen points of error, contending that the trial judge erred in various respects. We find his arguments meritless and affirm the trial court's judgment.

1. TEX PEN.CODE § 19.03(a)(2).

2. Unless otherwise indicated all future references to Articles refer to the Code of Criminal Procedure.

## I. SUFFICIENCY OF THE EVIDENCE

### A. The evidence

#### 1. *The autopsy*

On August 17, 1997, Gerardo Garcia died in the El Paso County Jail of a heroin overdose. Dr. Juan Contin, the Chief Medical Examiner of El Paso County, conducted the autopsy. Contin found that Garcia died of "acute narcotism," caused by morphine (a byproduct of heroin) found in his body. The concentration of morphine in Garcia's blood was 523 ng/ml—a level that was three times higher than the average when compared to 76 deaths due to acute narcotism that had been investigated by Contin's office from January 1995 to September 1997. Contin found a single fresh needle mark on one of Garcia's arms but observed no needle track marks. In Contin's opinion, the absence of track marks meant that Garcia was not a heroin addict. A sheriff's detective found a syringe in the section of the jail in which Garcia was confined.

#### 2. *Mario Hernandez*

At trial, two witnesses testified that the heroin overdose was involuntary-forced upon Garcia by Ortiz because Ortiz believed that Garcia had revealed Ortiz's role in some bank robberies. Mario Hernandez was in the same section of the jail as Garcia when he died. He testified that this particular section was known as the "Texas Syndicate tank" because it was set aside specifically to contain those associated with the Texas Syndicate. Mario was not a member of the Texas Syndicate but was placed in the tank because his cousin was a

3. Art. 37.071, § 2(g).

4. Art. 37.071, § 2(h).

member. Mario had not known Garcia or Ortiz before meeting them in the Texas Syndicate tank. According to Mario, Ortiz was the "tank boss," meaning he exercised *de facto* authority over the other inmates in the tank because of his status with the Texas Syndicate. Ortiz controlled what inmates requested from the jail commissary and he dealt with jailers on behalf of the other inmates.

When Garcia was brought into the tank, Mario saw Ortiz "freak." Mario overheard a conversation between Ortiz and Garcia in which Ortiz expressed great concern that Garcia had been caught for some bank robberies. Ortiz and Garcia argued about whether Garcia's capture was the result of being "snitched off" by Garcia's girlfriend or Ortiz's wife. Mario also overheard more than ten phone calls made by Ortiz in which Ortiz attempted to sell a trailer to get money to purchase heroin. Ortiz remarked that he wanted to bring heroin into the jail. Ortiz later succeeded in procuring heroin during visiting hours. Mario knew when Ortiz had obtained the heroin because Ortiz and another inmate were high on heroin when they returned from the visitor's booth. As a heroin addict, Mario could recognize when other people were high on the drug.

On August 17, Ortiz and several other inmates called Garcia into one of the individual cells within the tank—cell number five. Mario explained that he was seated at a table in the tank's day-room about five feet away from the doorway of that cell and could see inside. He then described seeing the following sequence of events: Garcia was sitting on a bunk bed in cell number five. Ortiz handed another inmate some heroin. This other inmate dissolved the heroin into water and placed it into a syringe. The syringe containing heroin was handed to Ortiz. Ortiz then injected the heroin into Garcia, who did not look like he wanted to be injected. Almost immediately, Garcia began shaking from what appeared to Mario to be "overdosing."

Ortiz noticed that Mario and another inmate not involved in the encounter had witnessed the events. Ortiz brought them heroin, and they injected themselves with it. He told them that Garcia had overdosed, that Garcia was stingy with the heroin and did it all, and that they were not to say anything about the incident.

On cross-examination, Mario admitted that he did not actually see the heroin exchange hands before it was "cooked." Defense counsel showed Mario a sketch of the floor plan of the tank. This sketch was prepared by a detective several days after the murder. Defense counsel asserted that the sketch showed that Mario was not really seated at the day-room table closest to cell number five but was actually seated at a table further away. However, Mario explained that he did not draw the sketch himself, and that, while he signed it, the sketch was inaccurate in some respects, including placing Ortiz and Garcia in the wrong locations.

On redirect, Mario explained that he could not really see the sketch while the detectives were drawing it, and he reiterated that he had an unobstructed view into cell number five from his seat at the day-room table. Finally, Mario testified that a photograph admitted as State's Exhibit 14 fairly and accurately depicted the view he had into cell number five; that photograph shows an unobstructed view into the cell.

### 3. *Hector Hernandez*

Hector Hernandez testified that he was not a member of the Syndicate but was a prospect Ortiz was trying to bring into the organization. Hector testified that he was in the Syndicate tank at the time of the incident in question and that Ortiz ran the

tank. Hector heard Ortiz say that Garcia had snitched him out and was going to have to die. Initially, Ortiz planned to stab Garcia but later decided to overdose the victim instead, to make it look like a suicide. Ortiz told Hector that some heroin had been obtained through a visit, and Ortiz planned to use three "dimes" of heroin to kill Garcia. Three days before Garcia died, Ortiz said he was going to kill Garcia. Although Hector was not a heroin user, he used heroin the night of the murder because Ortiz told him to. In addition, Ortiz told Hector to lie about the incident by saying the heroin belonged to Garcia. Hector also testified that he was afraid of Ortiz, that he knew both Garcia and Ortiz, and that Garcia was not a heroin user.

On cross-examination, Hector testified that Garcia indicated several times that he wanted to commit suicide because of the crimes he committed. Hector also testified that he had a deal with the State to testify but was told to say there was no deal. On redirect, Hector testified that no one told him that he had to testify in exchange for not being arrested. He further testified that he would be killed if he were incarcerated and that he testified earlier to having a deal because he was frightened of Ortiz. Hector also testified that his pending charge was due to an attempt to bring drugs into jail on Ortiz's orders.

### 4. *Law enforcement witnesses*

Louie Carreon, a detective with the El Paso Police Department, testified that Ortiz offered to give information on a bank robbery in exchange for help regarding a parole revocation warrant.

Thomas Lott, a special agent for the FBI, testified that an ex-girlfriend of Gar-

cia told the police that she believed that Garcia was involved in some bank robberies, that Garcia and Ortiz had counted money in her living room, and that Garcia had sold a vehicle to Ortiz. Law enforcement agents picked up Garcia, and he was identified by bank tellers in a photo lineup. While Garcia was being detained at the police station, Ortiz was brought near the area in which Garcia was located so that he could observe Garcia with law enforcement agents and be led to believe that Garcia was talking to the police. Special Agent Lott showed Ortiz a document indicating that Ortiz was a witness against Garcia and indicated that Garcia would know this. In reality, however, Garcia never cooperated with the authorities.

James Nance, a sergeant with the El Paso County Sheriff's Department, testified as an expert on prison gangs. Nance testified that Ortiz was the highest ranking member of the Texas Syndicate in El Paso that he was aware of. Given his high rank, Ortiz would automatically become a tank boss of any Texas Syndicate section, and he could even be able to order the death of someone in the tank.

### 5. *Defense witnesses*

The defense presented some testimony about Garcia's desire to commit suicide. Yvonne Chavira, a former girlfriend of Garcia,[5] testified that Garcia said he would kill himself if he were placed in jail again. During cross-examination, Chavira admitted that she had previously told lies to the authorities about Garcia. Doctor John Buscemi read a notation in a jail medical record that indicated Garcia felt suicidal at age 15. Alino Hernandez, a detention division commander for the El Paso Sheriff's

---

5. Some testimony by other trial witnesses indicates that she is the same ex-girlfriend that reported Garcia to the police, but no testimony was elicited from her concerning her report.

Department, testified that a 1990 screening form contained a "yes" answer to the question of whether Garcia had ever attempted or seriously considered committing suicide. However, a 1993 form said "no," a January 1994 form had "no" checked but "yes" circled, an August 1994 form had "no" circled accompanied with a question mark, and the latest form, in 1997, simply had "no" checked.

Finally, the defense attempted to impeach Hector's testimony through the testimony of his attorney, Donna Snyder. Snyder testified that Hector told her he had a deal with the State to "have a clean record and have a chance at a new life." But he expressed concern because it was his understanding that, if asked about it on the stand, he should testify that there was no deal. On cross-examination, the prosecutor showed Snyder a document filed in the clerk's office. This document stated that Hector would not be arrested and jailed for the drug possession case so long as he was a potential witness against Ortiz. The document also said that Hector was being housed as an out-of-state witness during the pendency of the trial, after which he would be returned to his originating state where his probation would resume. Snyder testified that the document did not seem consistent with what Hector had told her.

### B. Legal sufficiency—retaliation—"prospective witness"

■ In his fourth point of error, Ortiz claims the evidence is legally insufficient because the State failed to prove that Garcia was a prospective witness. He argues that the State did not establish that Garcia was likely to be a witness for the State.

We disagree because the statute does not require that a person's testimony be "likely" in order for that person to be a prospective witness. On the contrary, we have held that a "prospective witness" is any "person who may testify in an official proceeding." [6] Formal proceedings "need not be initiated." [7] Any person who is involved in an offense with a defendant, who sees the defendant committing an offense, or who hears the defendant discuss committing an offense is a "prospective witness" in the prosecution of that defendant because he "may" testify.

■ Ortiz complains that this interpretation changes the statute from "prospective witness" to "potential witness." He explains that the word "prospective" means "likely to become" whereas "potential" means "something that can develop." But "prospective" is also defined as pertaining to a prospect, and "prospect" as a "possibility." [8] While "prospective" can mean something different than "potential," it can also be synonymous with "potential." The Legislature's decision to use the word "prospective" does not prevent the statute from applying to situations in which "prospective" becomes synonymous with "potential."

■ Ortiz also argues that Garcia was not a prospective witness because he had a Fifth Amendment right to remain silent and there is no evidence that the State offered him immunity for his testimony. But whether a person will eventually testify does not affect whether he is, before trial, a prospective witness. It is impossible to know, until the moment of trial, who will actually testify in a case. A prosecutor may engage in extensive meetings with a witness with the intention of calling him

6. *Morrow v. State,* 862 S.W.2d 612, 614 (Tex. Crim.App.1993).

7. *Id.*

8. WEBSTER'S 3RD NEW INTERNATIONAL DICTIONARY 1821 (1966).

at trial, only to change his mind at the last minute. On the other hand, a prosecutor may believe initially that a witness has nothing to offer his case, but decide at the last minute to use his testimony. And, many times, the prosecutor himself will not know whether any given person will be available at the time of trial or be willing to testify. The phrase "prospective witness" encompasses all of these possibilities.

■ Finally, Ortiz argues that our conclusion nullifies subsection (a)(2) of § 36.06 because anybody found guilty under (a)(1) would necessarily be guilty under (a)(2). Subsection (a)(1) of § 36.06 prohibits harming or threatening to harm another in retaliation for his service as a public servant, witness, prospective witness, or informant. Subsection (a)(2) prohibits harming or threatening to harm another to prevent or delay his service as a public servant, witness, prospective witness, or informant. Ortiz claims that under our interpretation, "[t]here would be no point to even enact" (a)(2) because anyone who could be prosecuted under (a)(2) could also be prosecuted under (a)(1).

We disagree because the statutory overlap which Ortiz recognizes exists regardless of whether "prospective" is defined as "likely" or "may." Moreover, it exists only with regard to the phrase "prospective witness" and not public servant, witness, or informant-the other options in the statute. In interpreting statutes, we seek to avoid redundancies,[9] but we also endeavor to give effect to the whole statute, including each word and phrase.[10] And the mere fact that a defendant can be prosecuted under two different subsections of a

statute does not necessarily "nullify" either section of the statute, as Ortiz claims.

■ We conclude that the evidence was sufficient for a rational trier of fact to conclude that Garcia was a "prospective witness" and that Ortiz harmed him "in retaliation for or on account of" this fact. He was a prospective witness because he had been involved in a robbery with Ortiz and had already been identified by one of the robbery victims. Certainly, Garcia possessed information which could have been relevant at Ortiz's trial such that Garcia may have testified at that trial. In addition, a rational trier of fact could conclude from this evidence that Ortiz acted in "retaliation" because Ortiz knew that Garcia had been involved in the robbery with him. A rational jury could conclude that Ortiz harmed Garcia because he might testify against him. We overrule Ortiz's fourth point of error.

## C. Factual sufficiency—murder

■ In point of error eleven, Ortiz contends that the evidence is factually insufficient to prove that he murdered Garcia. In conducting a factual sufficiency review, we view the evidence in a neutral light and set aside the verdict only if the evidence supporting guilt is so obviously weak, or the contrary evidence so overwhelmingly outweighs the supporting evidence, as to render the conviction clearly wrong and manifestly unjust.[11] While a reviewing court has some authority to disregard evidence that supports the verdict, it must be appropriately deferential so as to avoid substituting its own judgment for

9. *Badgett v. State*, 42 S.W.3d 136, 139 (Tex. Crim.App.2001).

10. *Nguyen v. State*, 1 S.W.3d 694, 696 (Tex. Crim.App.1999).

11. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim.App.2000).

that of the fact finder.[12] The reviewing court should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony.[13]

Ortiz contends that the evidence is factually insufficient because Mario's testimony that he saw Ortiz inject Garcia with heroin is not credible and should be disregarded. In support of this contention, Ortiz argues that a sketch of the jail shows that Mario could not have had an unobstructed view of the crime. He also points out that Mario admitted to not seeing everything that occurred in cell number five during the incident in question. Finally, Ortiz contends that Mario's credibility is undermined by his extensive criminal history and admitted heroin addiction.

As discussed above, Mario testified that the jail sketch was inaccurate in some respects. And while he admitted that he did not see the heroin exchange hands before it was cooked, he maintained that he saw the heroin being cooked, saw the syringe being passed to Ortiz, and saw Ortiz inject Garcia with the contents. Although Mario had a criminal history and was a heroin addict, his credibility was a matter for the jury to decide. After reviewing the evidence in a neutral light, we find that the evidence in support of the conviction is not so weak as to render the conviction clearly wrong and manifestly unjust. Point of error eleven is overruled.

## II. VOIR DIRE

In points of error two, three, nine, ten, and thirteen, Ortiz complains about the trial court's granting of State's challenges for cause against prospective jurors who had conscientious scruples about the death penalty. Ortiz initially claims that Article 35.16 is unconstitutional on its face, in violation of *Wainwright v. Witt*,[14] and any challenges granted pursuant to that statute must be deemed invalid. However, we have already held that Article 35.16 "is a ground for disqualification only to the extent constitutionally permitted by *Witt*." [15] Having already narrowed the scope of the statute to what is constitutionally permissible, we perceive no further basis for complaint.

■■■ Ortiz next contends that a number of jurors were excused in violation of *Witt*. With one exception—the subject of point of error three—Ortiz did not object to the trial court's actions in granting the State's challenges. A party must object to the granting of a challenge for cause before he can complain of that action on appeal.[16] Because Ortiz failed to object, his complaints were not preserved with respect to all the challenges except for the complaint raised in point of error three, which we shall discuss below.

■■■ Ortiz also argues that counsel's failure to object in these instances constitutes ineffective assistance. If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an

12. *Wesbrook v. State*, 29 S.W.3d 103, 112 (Tex.Crim.App.2000), *cert. denied*, 532 U.S. 944, 121 S.Ct. 1407, 149 L.Ed.2d 349 (2001).

13. *Id.*

14. 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

15. *Ramos v. State*, 934 S.W.2d 358, 366 (Tex. Crim.App.1996).

16. *Ladd v. State*, 3 S.W.3d 547, 562 (Tex. Crim.App.1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000); *Purtell v. State*, 761 S.W.2d 360, 365 (Tex.Crim. App.1988), *cert. denied*, 490 U.S. 1059, 109 S.Ct. 1972, 104 L.Ed.2d 441 (1989).

ineffective assistance claim on direct appeal.[17] Counsel's reasons for failing to object do not appear in the direct appeal record. And it is possible for counsel to have legitimate reasons for declining to object to a trial court's granting of a State's challenge for cause.[18] Accordingly, we deny relief on Ortiz's ineffective assistance claims. Points of error two, nine, ten, and thirteen are overruled.

We now turn to point of error three, in which an objection was made. Ortiz claims that venire member Deporto was excused in violation of *Witt*. During general voir dire, the trial court addressed the subject of conscientious scruples against the death penalty, eventually asking jurors who had such scruples to approach the bench:

> I am going to ask you some questions about your convictions regarding the death penalty. Be assured that I am not now assuming that you will find the defendant guilty of capital murder or of any other crime in this case. Nevertheless, it is necessary to learn your state of mind about capital punishment in general, to determine whether you have an open mind as regards what might be a just and proper sentence in a capital case if the defendant in that case is found guilty as charged.
>
> So I am asking about your state of mind regarding capital murder in general. I am not asking in this next question what you think would be a just penalty in this case or any particular case. I'm not at this time even asking you about your opinion as regards the death penalty in a retaliation capital murder case. And I am most especially not asking what you might think would be a just

verdict in this case—in this particular case. *I am asking, rather, whether for religious or philosophical or any other reason you believe that the death penalty should never be inflicted in any case, regardless of what the evidence might be.*
>
> In answering this next question, keep in mind that the circumstances and motives for the commission of crimes, including capital murder, are unlimited. Place a check mark by your answer, yes or no. Do you have conscientious scruples in regard to the infliction of death for a person convicted of capital murder? Yes or no? If you have answered the proceeding [sic] question yes, come up to the bench now.

(Emphasis added). Deporto was one of the prospective jurors who responded to the trial court's invitation. After Deporto introduced herself at individual voir dire, the following exchange occurred:

> [DEPORTO]: I have seen other murder cases and have agreed with the death penalty, but I don't feel I could bring a death penalty for somebody, to put that pressure on me.
>
> [COURT]: Ma'am, it's not a question right now of how you feel about your serving as a juror. Right now, are you opposed to the death penalty in all cases?
>
> [DEPORTO]: No, sir.
>
> [COURT]: Could you ever, sitting as a juror, no matter—no matter what the evidence showed, vote to inflict the death penalty?
>
> [DEPORTO]: No, sir.
>
> [COURT]: Anybody want to ask a further question.

---

**17.** *Thompson v. State,* 9 S.W.3d 808, 813–814 (Tex.Crim.App.1999).

**18.** *See Butler v. State,* 872 S.W.2d 227, 242 (Tex.Crim.App.1994), *cert. denied,* 513 U.S. 1157, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995).

Neither the State nor the defense accepted the trial court's invitation to ask additional questions. The State then challenged for cause, the trial court granted the State's challenge, and Ortiz objected.

■ Initially, we address the State's contention that Ortiz failed to preserve error because he did not obtain a ruling on his objection. The State relies upon Texas Rule of Appellate Procedure 33.1, which requires, among other things, that the record show "the trial court . . . ruled on the . . . objection . . . either expressly or implicitly." We have held that an objection after a challenge for cause is sustained is by itself sufficient to preserve error.[19] We see no reason to depart from our prior precedent to impose a requirement that a ruling be obtained on an objection leveled immediately after a challenge for cause is granted. So long as the objection is made immediately after the challenge is granted, the discharge of the prospective juror from service is tantamount to an adverse ruling on the objection.

■ We turn to the merits. Under *Witt*, a prospective juror may be excused for cause if her views about the death penalty would substantially impair the performance of her duties as a juror in accordance with her instructions and oath.[20] Ortiz contends that Deporto's negative answer to the trial court's question, "Could you ever, sitting as a juror, no matter—no matter what the evidence showed, vote to inflict the death penalty?" was correct because, at that point in the trial, she had not even found Ortiz guilty. Ortiz's contention is that the question as worded asks the juror if he can answer the special issue in the State's favor no matter what the evi-

dence shows. Ortiz concludes that, as a result, the record fails to show substantial impairment. We disagree.

■ The trial court's question to Deporto, asking whether she could vote to inflict the death penalty, was not clearly worded, and any answer to that question, in isolation, would be inconclusive on the question of whether a prospective juror is challengeable under *Witt*. However, the trial court had earlier phrased the issue clearly and correctly (see italicized portion of trial court's statements), and the question directed specifically at Deporto was asked in the context of a juror who had already expressed doubt about her ability to personally assess the death penalty. A prospective juror is challengeable for cause under *Witt* if she could never personally impose the death penalty, regardless of the facts of the case, even though she might support imposition of the death penalty in the abstract or if someone else imposed it.[21] Although the trial court's question to Deporto was ambiguous, the record in this case was sufficient for the trial court to believe that Deporto could never personally vote in a such a manner that the death penalty would be assessed. The trial court did not abuse its discretion in granting the State's challenge for cause. Point of error three is overruled.

## III. JURY CHARGE

### A. *Ex Post Facto* violation/wrong version of statute

In his first point of error, Ortiz claims the trial court's retroactive application of the retaliation statute to his case violated the *ex post facto* clause of the United

19. *Barefield v. State*, 784 S.W.2d 38, 41 (Tex. Crim.App.1989), *cert. denied*, 497 U.S. 1011, 110 S.Ct. 3256, 111 L.Ed.2d 766 (1990).

20. 469 U.S. at 424, 105 S.Ct. 844.

21. *Robinson v. State*, 851 S.W.2d 216, 227–228 (Tex.Crim.App.1991), *cert. denied*, 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994).

States Constitution. He explains that at the time that he allegedly committed this offense, § 36.06 criminalized harming or threatening to harm another for his "service" as a public servant, witness, prospective witness, or informant. But by the time of Ortiz's trial, the statute had been changed to criminalize harming or threatening to harm another for his "service or status" as one of those named persons. At Ortiz's trial, the judge charged the jury with the amended definition of retaliation rather than the definition in effect at the time of the offense.

 Ortiz's argument is misplaced. Both the federal and state constitutions prohibit the promulgation of any "ex post facto law."[22] This prohibition "bars application of a law 'that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.' "[23] In both provisions, the language is directed at the Legislature, not the courts. In *Ieppert v. State*,[24] we did not appear to appreciate the distinction, but that failure was understandable in light of the Supreme Court's case in *Bouie v. City of Columbia*,[25] which stated that due process prohibited the judiciary from achieving, through construction of a statute, the exact same consequence that would be prohibited by the *ex post facto* clause if the Legislature had so acted. Recently, the Supreme Court held this statement to be *dicta* and clarified that the

*ex post facto* clause does not apply to the judiciary, and due process does not incorporate all of the *ex post facto* clause's strictures.[26] In holding that the protections are not coextensive, the Court pointed to "important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other."[27] Indeed, the Supreme Court has indicated that an *ex post facto* problem does not arise from a trial court's erroneous retroactive application of a statute, but only if the statute itself has retroactive effect.[28]

So in order to prevail on his *ex post facto* claim, Ortiz would have to show that § 36.06 itself operates retroactively,[29] rather than that the trial court retroactively applied it. He does not do so. He does not even contend that § 36.06 itself operates retroactively, and our review of the statute confirms that it does not. We find no *ex post facto* violation in this case.

Ortiz's point of error could also be construed as arguing that the trial court's charge to the jury was erroneous because it relied on the wrong version of the statute. With this contention, we agree. The record reflects that the judge charged the jury on the current version of § 36.06 rather than the version in effect at the time of the offense.

 Since Ortiz did not object to the charge on this basis, we review this error

---

**22.** *See* United States Constitution, Article I, § 10; Texas Constitution, Article I, § 16.

**23.** *Johnson v. United States*, 529 U.S. 694, 699, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000), *quoting Calder v. Bull*, 3 Dall. 386, 390, 1 L.Ed. 648 (1798).

**24.** 908 S.W.2d 217, 220 (Tex.Crim.App.1995).

**25.** 378 U.S. 347, 353–354, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

**26.** *Rogers v. Tennessee,* 532 U.S. 451, 457–62, 121 S.Ct. 1693, 1698–1700, 149 L.Ed.2d 697 (2001).

**27.** *Id.* at 1699.

**28.** *Johnson v. United States*, 529 U.S. 694, 701–702, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000)(because new statute did not apply retroactively, no *ex post facto* question arises; only question is whether the old statute authorized the trial court's action).

**29.** *Id.*

for "egregious harm." [30] Egregious harm exists when the defendant has been denied a fair and impartial trial.[31]

■ The charge permitted the jury to convict Ortiz if it found that he had killed Garcia in retaliation for his "service or status" as a prospective witness, but it should have only permitted conviction for killing Garcia on account of his "service" as a prospective witness. While this charge did broaden the scope of the offense, the facts of this case do not reflect that Ortiz suffered egregious harm. As noted *supra* in point of error four, the evidence demonstrated that Garcia was a prospective witness against Ortiz because he had been involved in a robbery with Ortiz and had already been identified by one of the robbery victims. A rational trier of fact could conclude from this evidence that Ortiz acted in "retaliation" because Ortiz knew that Garcia had been involved in the robbery with him.

This evidence supports a conclusion that Ortiz murdered Garcia due to either his status or his service as a prospective witness. As explained in point of error four, some redundancies exist in the statute with regard to the phrase "prospective witness." This is also true when the words "status" and "service" are considered. With the other options in the statute—public servant, witness, and informant—there is a clear difference between that person's status versus his service. But with a "prospective witness," the line is blurred, since the word "prospective" denotes a future event. There is little difference between a prospective witness'

status and his service. As a result, we cannot conclude that Ortiz was egregiously harmed by the erroneous charge. We overrule Ortiz's first point of error.

## B. Requested suicide instruction

In point of error five, Ortiz contends that the trial court erred in denying his request for an instruction in the jury charge on suicide as a defense to the crime. Ortiz asked the trial court to submit the following instruction to the jury: "If you find from the evidence that the deceased, Gerardo Garcia, came to his death by a wound inflicted by himself with his own hands, or you have a reasonable doubt thereof, you will acquit the defendant." Ortiz contends that the trial court erred in refusing the instruction because the accused has the right to an instruction on any defensive issue raised by the evidence.

■ But a defensive instruction is not required when the issue in question is not a statutorily-enumerated defense and merely serves to negate elements of the State's case.[32] For this reason, we have held that trial courts are not required to give jury instructions on "independent impulse"[33] or "alibi."[34] There is no suicide defense in the Penal Code (or in any other statute) to the crime of capital murder, and the defense's suicide theory simply negates elements of the State's case (i.e. whether Ortiz killed Garcia as the State has alleged). The trial court did not err in denying the instruction. Point of error five is overruled.

30. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g).

31. *Id.*

32. *Solomon v. State*, 49 S.W.3d 356, 369 (Tex. Crim.App.2001); *Giesberg v. State*, 984 S.W.2d 245, 248 251 (Tex.Crim.App.1998),

cert. denied, 525 U.S. 1147, 119 S.Ct. 1044, 143 L.Ed.2d 51 (1999).

33. *Solomon*, 49 S.W.3d at 369.

34. *Giesberg*, 984 S.W.2d at 248–251.

## IV. EXCULPATORY EVIDENCE

 In point of error six, Ortiz contends that the State suppressed a secret deal with Hector in exchange for Hector's testimony.[35] Ortiz relies solely upon evidence in the trial record; he did not raise the claim in a motion for new trial. The evidence presented at trial does not prove that there was a deal between Hector and the State; it shows merely that the State took various measures to protect Hector's safety so that he would not be killed before he testified. And to whatever extent that the evidence presented at trial might support the existence of a deal, that evidence was before the jury. Ortiz fails to show that the State suppressed exculpatory evidence. Point of error six is overruled.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

In points of error seven, eight, and twelve, Ortiz contends that he received ineffective assistance of counsel at trial. To succeed on an ineffective assistance claim, the defendant must show: (1) counsel's performance was deficient and (2) the deficient performance prejudiced his defense.[36] To show deficient performance, the defendant must prove by a preponderance of the evidence that his counsel's representation fell below the standard of professional norms.[37] To demonstrate prejudice, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[38]

### A. Membership in gang

 In point of error seven Ortiz contends that counsel performed ineffectively by failing to object to evidence of Ortiz's affiliation with the Texas Syndicate and to the prosecutor's comments about this gang affiliation in opening statement and closing arguments. When an ineffective assistance claim alleges that counsel was deficient in failing to object to the admission of evidence, the defendant must show, as part of his claim, that the evidence was inadmissible.[39] Ortiz claims the Texas Syndicate evidence was irrelevant under Texas Rule of Evidence 402 and constituted impermissible character evidence under Texas Rule of Evidence 404. We find that the evidence was admissible and that the State's comments, based upon such evidence, were proper.

Ortiz complains about testimony relating to the Texas Syndicate and Ortiz's association therewith. The evidence can be summarized as showing the following: (1) the Texas Syndicate has conflicts with other gangs and must be segregated in the jail system, (2) Ortiz is a high ranking member of the Syndicate, (3) as a high ranking member, Ortiz controlled the Syndicate tank, was the contact person with jail officials for all members of the tank, controlled the exercise of jail privileges including what items were ordered at the commissary, conducted numerous meetings with other gang members, and could have other inmates killed, and (4) Hector was a prospect being brought into the Syndicate by Ortiz.

Rule 404(b) provides in relevant part:

---

35. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)(due process violated by the government's suppression of exculpatory evidence); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)(*Brady* applies to impeachment evidence).

36. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

37. *Id.* at 688, 104 S.Ct. 2052.

38. *Id.* at 694, 104 S.Ct. 2052.

39. *See Jaubert v. State,* 74 S.W.3d 1 (2002).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.... [40]

Gang membership evidence is admissible under Rule 404(b)(and Rule 402) if it is relevant to show a noncharacter purpose that in turn tends to show the commission of the crime.[41]

The testimony in question served a variety of noncharacter purposes relevant to showing Ortiz's guilt of the crime. Conflicts between gangs explained why the Texas Syndicate had its own tank. Ortiz's status in the gang proved a variety of things. First, his high ranking in a criminal gang explained his ability to smuggle heroin into the jail and tended to show that the heroin was Ortiz's, not Garcia's. Second, Ortiz's high ranking in the organization and his control over the tank tended to prove his opportunity and ability to carry out the crime. It explained Ortiz's ability to gain the cooperation of other inmates to restrain Garcia and force an injection of heroin without leaving signs of a struggle. Third, the evidence tended to rebut defense impeachment of the State's witnesses. Ortiz's position in the Texas Syndicate explained inconsistencies in Hernandez's and Hector's statements by showing that statements favorable to Ortiz were motivated by their fear of him. The evidence also tended to rebut the defense claim that a secret deal existed between the State and Hector by explaining why the State declined to incarcerate Hector and why Hector testified on cross-examination that there was a deal. Point of error seven is overruled.

## B. Attempt to smuggle heroin into the jail

Ortiz next contends that counsel performed ineffectively by failing to object to evidence that Ortiz attempted to have heroin smuggled into the El Paso County jail. But the State did not introduce this evidence until *after* defense counsel used the drug smuggling offense to impeach Hector's credibility and to argue that he had entered into a secret deal with the State. It was then that the State proved the connection between that offense and Ortiz's orders. Defense counsel's use of the extraneous offense to impeach Hector was clearly trial strategy. Once that trial strategy was invoked, defense counsel could have rationally believed that he was not in a position to prevent the evidence of Ortiz's involvement. Ortiz's role gave a more complete picture of the offense and helped explain why the State was willing to unilaterally forego prosecuting Hector.

Moreover, the evidence showed a scheme or plan by Ortiz to import heroin into the jail—which in turn tends to substantiate the State's theory that Ortiz killed Garcia with heroin. In addition, the drug smuggling offense tended to show Hector's close association with Ortiz. While such evidence has some tendency to show that Ortiz is a criminal generally, given the legitimate purpose of the evidence, the trial judge did not abuse his

---

**40.** Tex.R. Evid. 404(b). Ortiz concedes that he was given the proper notice of the State's intent to offer this evidence.

**41.** *See Vasquez v. State,* 67 S.W.3d 229, 239–240 (Tex.Crim.App.2002); *Medina v. State,* 7 S.W.3d 633, 643–644 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000).

discretion in finding that the evidence was admissible under R. 403.[42] Point of error eight is overruled.

## C. Hearsay

██ In point of error twelve, Ortiz contends that counsel performed ineffectively by failing to object to hearsay statements relayed by Special Agent Lott. Ortiz complains that Lott relayed hearsay evidence from an ex-girlfriend of Garcia and from a fingerprint examiner that connected Garcia to several bank robberies.

Trial counsel's reasons for failing to object do not appear in the record. Arguably, the evidence was admissible to show why Lott's investigation focused upon Garcia and Ortiz. When the State first introduced the statements from Garcia's ex-girlfriend, defense counsel objected on the basis of hearsay, the objection was sustained, and the trial court gave the jury an instruction to disregard. The State then asked Lott whether he knew the statements were true (he did not) and whether the statements had an impact on his investigation (they did).

Moreover, had defense counsel pursued a hearsay objection on these topics, the State might have chosen to introduce the evidence directly through Ortiz's ex-girlfriend and the fingerprint examiner. Defense counsel might have believed that such direct evidence would have a more powerful and adverse effect on the jury than the evidence the State was content to offer. Point of error twelve is overruled.

The judgment of the trial court is affirmed.

KELLER, P.J., and WOMACK, J., filed concurring opinions.

KELLER, P.J., filed a concurring opinion.

We have previously addressed the meaning of "prospective witness." In *Morrow v. State*, we held that the retaliation statute does not require the initiation of official proceedings for one to be a prospective witness.[1] Although the Court does not disturb this holding, it should be noted that its opinion today conflicts with some of the distinctions drawn by *Morrow* between prospective witnesses and informants. The Court effectively disavows any suggestion in *Morrow* that a certain level of cooperation or visibility is required for a person with relevant information to become a prospective witness.

I agree with the Court's analysis and join the Court's opinion.

WOMACK, J., filed a concurring opinion.

I join the Court's opinion, including its rejection of the appellant's insufficient-evidence argument. There is an additional, historical support for the Court's construction of the term "prospective witness" in the retaliation statute. The term was added in 1983 to cure a defect that this court had found in 1982.

In its original enactment in 1973, the offense of retaliation was defined as conduct "in retaliation for or on account of the service of another as a public servant, witness, or informant."[1] Neither "wit-

42. Tex.R. Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay,

or needless presentation of cumulative evidence.

1. 862 S.W.2d 612, 613 (Tex.Crim.App.1993).

1. Penal Code Act, 63d Leg., R.S., ch. 399, § 1, sec. 36.06(a), 1973 Tex. Gen. Laws 883, 948.

ness" nor "informant" was defined, possibly because the terms were not in the proposed penal code of 1970, which limited the offense of retaliation to acts against public servants or former public servants.[2]

In 1982 we decided that "the term 'witness' means 'one who *has* testified in an official proceeding,' and does not include a mere 'prospective witness.'"[3] We noted the comment of drafters of the penal code.[4] The comment was, "'Witness' is not defined, but presumably the term will be construed to mean only one who testifies before an official proceeding, *cf.* Section 36.05; otherwise, location of the 'witness' part of the offense in this chapter would be inappropriate."[5] We also compared the retaliation statute (section 36.06) with the tampering-with-witness statute (section 36.05), which defined the offense as acts toward "a witness or prospective witness."[6] Our holding was made "[i]n light of the fact that the legislature has, by statute, differentiated offenses against 'witnesses' only and 'witnesses and prospective witnesses.'"[7]

The next legislature eliminated the discrepancy between the statutes. It did so by amending the retaliation statute to protect "prospective witnesses," just as the tampering statute did.[8]

We know, from legislative history, the reason for the inclusion of "prospective witnesses" in the tampering statute: "Note that the person whom the actor attempts to influence need not actually be a witness. Tampering with a prospective witness creates a risk of interfering with an official proceeding even if the person bribed or threatened has not been officially called to offer evidence."[9] I think that the legislature amended the retaliation statute for the same reason. To construe the statute as this appellant proposes would be contrary to that policy. The text of the statute does not make the appellant's proposal any more likely than the construction we have given it, and our construction is in accord with the legislative history, while his is not.

**2.** *See* STATE BAR COMMITTEE ON REVISION OF THE PENAL CODE, TEXAS PENAL CODE: A PROPOSED REVISION § 36.06 (Final Draft 1970).

**3.** *Benson v. State,* 661 S.W.2d 708, 711 (1982) (on original submission).

**4.** *Id.,* at 710.

**5.** Seth R. Searcy & James R. Patterson, *Practice Commentary,* 4 VERNON'S ANNOTATED CODES: PENAL CODE 22, 23 (1974).

**6.** *Benson,* 661 S.W.2d at 710 (quoting Penal Code Act, 63d Leg., R.S., ch. 399, § 1, sec. 36.05(a), 1973 Tex. Gen. Laws 883, 947).

**7.** *Id.,* at 711.

**8.** Act of June 19, 1983, 68th Legislature, R.S., ch. 558, § 4, 1983 Tex. Gen. Laws 3237, 3238.

**9.** STATE BAR COMMITTEE ON REVISION OF THE PENAL CODE, *supra* note 2, § 36.05 Committee Comment. When the committee's proposals were enacted without substantive change, as the tampering statute was, the drafters' comments are the most important expression of the legislative history. *See Aguirre v. State,* 22 S.W.3d 463, 471 (Tex.Cr.App.1999).