**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00120-CR**
_____

**ROBERT GORDON LETOURNEAU, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Cause No. 1635010**
_____

**MEMORANDUM OPINION**

Appellant Robert Letourneau was convicted of solicitation of capital murder and sentenced to life imprisonment in the Institutional Division of the Texas Department of Criminal Justice.[1] Tex. Penal Code Ann. §§ 15.03(a), 19.03(a). In his

---

[1] This case was transferred to this Court from the Fourteenth Court of Appeals in Houston, Texas, pursuant to a docket equalization order. *See* Tex. Gov't Code Ann. § 73.001.

sole issue on appeal, he challenges the sufficiency of the evidence to support the verdict against him. We affirm.

## I. Background

### A. The State's Case

For several years before the events giving rise to this case, Appellant and Brooke Larson[2] were in a dating relationship. When the relationship soured, Larson sought, and was granted, a restraining order prohibiting Letourneau from entering the residence that the two of them had shared. Letourneau responded to this action first by returning to the house, and later by allegedly kidnapping and robbing her.

While he was incarcerated and awaiting trial for these offenses, Appellant conceived a plot to have Larson murdered so that she would be unable to testify against him as to any of the pending charges. In furtherance of his plan to kill Larson, Appellant conspired with Jerry Pinyerd, a fellow inmate, and requested that Pinyerd locate someone who would kill Larson in exchange for a share of the sales price of some valuable automobile parts. Pinyerd contacted law enforcement authorities, who then devised a plan to have undercover officers meet with both Appellant and

---

[2] Because the Texas Constitution grants crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[,]" we use a fictitious name to identify the individual identified in the record as the intended victim of the crime alleged. *See* Tex. Const. art. I, § 30(a)(1).

Pinyerd to investigate Pinyerd's allegation and to gather evidence against Appellant. Pinyerd did not testify at trial, but the officers involved in the undercover activities testified regarding the evidence that they gathered in support of the case. The jury found Appellant guilty of solicitation of capital murder and Appellant timely filed a notice of appeal. We summarize the testimony and evidence below.

### 1. Lieutenant Arfele's Testimony

Lieutenant Arfele of the Harris County Sheriff's Office described his experience and training in the law enforcement field, as well as his specific assignment as watch commander at the Harris County jail in late April of 2019, when Appellant and Pinyerd were inmates at that facility. During Arfele's tenure at the jail, Pinyerd approached Arfele through another officer; Arfele then met with Pinyerd, and that meeting led Arfele to contact the Harris County District Attorney's Office so that the matter could be further investigated.

### 2. Detective Patterson's Testimony

Detective Patterson with the Houston Police Department described his law enforcement background and indicated that he became involved in the instant case when Sergeant Seagler requested his assistance with the investigation. Specifically, Seagler asked Patterson to obtain a release of Appellant's storage unit keys, because the storage unit apparently contained the automobile parts that were intended to

finance Larson's murder. Upon retrieving the keys, Patterson delivered them to Seagler.

### 3. Detective Seagler's Testimony

Sergeant Seagler, a longtime detective with the Houston Police Department, indicated that the major offender's division, where he is assigned, investigates crimes that do not readily lend themselves to other divisions, including murder-for-hire cases. He described the procedure for approaching this type of case, noting that the initial step would involve researching and interviewing everyone involved, and then checking the information for reliability. After determining that the murder plot was genuine, the officers develop a plan unique to the situation, so that it will be believable and workable. When first meeting the suspect, it is important to establish a rapport, so that each step of the process will naturally flow from the previous one.

Seagler became involved with this case when the Harris County District Attorney's Office contacted him and requested him to play the role of the killer for hire. To further this "sting operation" Seagler first met with Pinyerd, also known as "Minus 1," to arrange for him to introduce Seagler to Appellant and vouch for Seagler's authenticity as a "hitman." The authorities then provided Pinyerd a telephone number to give Appellant, with the expectation that Appellant would call that number if he wished to advance the reported plan to murder Larson. Seagler used the alias "Joe" while working in an undercover capacity, and his partner used

4

the name "Rusty." When Appellant called Seagler at the number that Seagler had provided through Pinyerd, the two of them discussed the objective over the telephone on four occasions, and eventually met at the jail both before and after completing Larson's alleged murder. Seagler recorded these conversations and played them for the jury.

During his testimony, Seagler laid out the steps in the investigation. They obtained the key to the storage unit and searched and photographed the contents; they verified that Appellant was serious about his wish to have Larson killed; they staged Larson's murder; they confronted Appellant about the apparent murder; and they searched Appellant's jail cell to retrieve the notes he had used to communicate with Seagler. Seagler acknowledged that he and Appellant used coded language to communicate about the planned murder and stated that it is normal to do so because of the necessarily clandestine nature of the intended crime.

### 4. Investigator Mauldin's Testimony

Mauldin described his career path, which eventually led him to become an investigator at the Harris County District Attorney's Office, a position he has held since 2007. Much of his current job involves locating and interviewing witnesses and collecting and evaluating evidence. The major offender's division, where the witness was currently assigned at the time of trial, primarily focuses on murder

investigations, including the solicitation of capital murder that is the subject of this case.

Like Seagler, Mauldin described the usual course of approaching such a case, noting that it requires investigating the report to determine its legitimacy and developing a strategy appropriate to the situation and the individuals involved. After an unsuccessful attempt to record a conversation between Pinyerd and Appellant, Mauldin met with Pinyerd several more times to obtain information about Pinyerd's conversations with Appellant. During one such meeting, Mauldin gave Pinyerd a telephone number to call to reach Sergeant Seagler, as the hitman, to discuss the murder for hire of Appellant's former girlfriend, Larson. Letourneau called Seagler, and Mauldin listened to those conversations. He echoed the testimony of other witnesses regarding the development and execution of the plan, and described the June 12, 2019 meeting with Appellant, when detectives met with Appellant, ostensibly to inform him of Larson's death. After that meeting, they obtained a search warrant for Appellant's jail cell, and the items recovered during that search included Appellant's various handwritten notes, including his statement that he had earlier refused to speak with law enforcement officers because he believed that they were planning to entrap him.

## 5. Brooke Larson's Testimony

As noted above, Larson and Appellant were in a romantic relationship for several years. When Appellant's financial issues made their relationship increasingly problematic, she told him not to return from a trip to California.

Appellant returned to the Houston area despite Larson's request, and the ensuing friction between them caused her to obtain a restraining order against him, which he promptly violated. Soon afterward, he filed a lien against her house, apparently contending that he had performed work and paid for materials used in the renovation of the property, which Larson denied. Approximately one month later, Appellant kidnapped Larson as she was leaving her office. He forced her to withdraw money from three ATMs, and repeatedly threatened to kill her if she either failed to follow his instructions or attempted to communicate with anyone. Fortunately for Larson, she and her daughter had previously devised a code phrase to communicate danger. Larson was able to use this method to alert her daughter of the threat, and her daughter called the police. After Larson convinced Appellant that her daughter had called the police, he dropped her off near her house and left the scene on foot. Larson pressed criminal charges against Appellant, and he was arrested approximately a week after the kidnapping.

Due to the anxiety caused by Appellant's actions, Larson closed her business and left the state. She remained away until Seagler contacted her and requested her

cooperation in setting up the murder for hire case against Appellant. Larson participated in staging her own murder in the bathroom of the house she previously shared with Appellant so that law enforcement authorities could show Appellant a photograph of the purported crime scene.

### 6. The Recordings

The State's exhibits 4 through 9 contain recordings of telephone and face-to-face conversations between Appellant and Seagler. Although the audio quality of the recorded telephone conversations is good, the other recordings are less than ideal, due to the technical capability of the recording equipment used and the acoustics at the jail, where Seagler met Appellant and recorded their interactions.

In the initial telephone conversation, Appellant called Seagler, or "Joe," at the number Pinyerd had previously given Appellant, and stated, "Minus told me to give you a call." Over the course of all four of the calls, Seagler and Appellant can be heard discussing whether to accomplish Larson's murder by means of a road rage incident or a burglary. It is clear that they are discussing Larson in the conversations because they specifically mention her street address and the name of her business. Moreover, it is apparent that they are planning a murder; not only does Seagler, posing as "Joe," mention the risk of engineering a road rage incident to kill Larson, citing the threat traffic cameras would pose, he instead suggests a break-in at Larson's home, and the two discuss Larson's upgraded alarm system and living

8

arrangements in the context of the likelihood of successfully committing the murder and the chance of being caught. They also discuss the automobile parts to be sold to finance the cost of "Joe's" services, and the ready availability of guns in the state.

The recordings made in the Harris County jail reflect the same content as the telephone recordings. They are, however, more informative, because they show Appellant and "Joe" communicating by means of notes held up to the glass partition separating them, to avoid being overheard. Some of these notes are either legible on the recording or are in evidence and demonstrate the nature of Appellant's intent; one of Appellant's notes reads "no witness no charge." Most of the conversations focused on the details of the murder plot, the means of payment therefor, and the secrecy needed to avoid detection.

## B. Appellant's Testimony

Appellant was the sole defense witness at both the guilt and the punishment phase of his trial wherein he disputed every piece of evidence against him. He testified that he and Larson had a wonderful relationship, and that the restraining order took him by surprise. He testified that he neither kidnapped nor robbed her. Most importantly, Appellant denied that he solicited Pinyerd to help him hire someone to kill Larson. Instead, he offered other explanations of the incriminating evidence that the State had presented. He stated that the incident Larson portrayed as a kidnapping and robbery was a consensual encounter, and that Larson voluntarily

9

gave him money to repair his vehicle. Appellant acknowledged that although he did seek help from other inmates, including Pinyerd, to liquidate the contents of his storage unit, he planned to use the sales proceeds not to pay a hired killer, but to hire an attorney to represent him in an unrelated case. As for the plan to murder Larson, he testified that he thought from the beginning that the murder conspiracy was fictitious, because Pinyerd told him so; he stated that he played along with the contrived murder plot to induce the authorities to deposit funds into his jail commissary account. He did not, however, explain how Pinyerd and the authorities intended to "frame" him for a murder for hire, or why he voluntarily cooperated in what he described as a "setup," and an attempt to "scam" him. He likewise did not explain why he would willingly participate in the fictional murder-for-hire scheme for the $130 deposit he received into his inmate account, or why the State would have targeted him with the plan in question.

## II.  Standard of Review

Evidence is legally sufficient to support a criminal conviction if any rational trier of fact could have found each essential element of the offense beyond a reasonable doubt after considering the cumulative force of all the incriminating circumstances in the light most favorable to the conviction. *See Jackson v. Virginia*, 443 U.S. 307, 313-14 (1979); *Ramsey v. State*, 473 S.W.3d 805, 808-09 (Tex. Crim. App. 2015); Tex. Penal Code Ann. § 2.01.

10

### III. Analysis

To substantiate Appellant's conviction for solicitation of capital murder, the evidence must show that he requested, commanded, or attempted to induce Pinyerd to solicit another person to murder his intended victim for remuneration. Tex. Penal Code Ann. § 15.03(a); Tex. Penal Code Ann. § 19.03(a)(3). Appellant contends that the State could not satisfy this burden because Pinyerd was unavailable to testify at trial, and the State therefore could not prove beyond a reasonable doubt that Appellant solicited Pinyerd to do anything at all, much less facilitate a murder for hire. We disagree.

While it is true that no witness stated under oath that Appellant solicited Pinyerd to commit capital murder, and that nowhere in the recordings or in his testimony did Appellant admit to having done so, the jury's consideration was not limited to such direct evidence. Instead, the jury was permitted to draw reasonable inferences from the evidence, and to believe or disbelieve any portion of the evidence presented. *See Edward v. State,* 635 S.W.3d 649, 655-56 (Tex. Crim. App. 2021).

The record contains ample evidence from which the jury could have found beyond a reasonable doubt that Appellant solicited Larson's murder. Appellant sought to pay someone to kill Larson; murder for remuneration constitutes capital murder. Tex. Penal Code Ann. § 19.03(a)(3). Not only did Seagler and Mauldin

11

testify that Appellant was planning Larson's murder for hire, but Appellant's own conversations as contained in the recordings submitted to the jury establish and support the conclusion that Appellant intended to pay Seagler to kill Larson. Their discussions included a cost/benefit analysis of staging a burglary versus a road rage incident, noting the likelihood of being apprehended with either plan. Appellant preferred the road rage approach to the murder but was dissuaded by Seagler's logic that following that plan involved too great a risk of being detected; as Seagler noted, dashboard cameras were everywhere, and a burglary would be "cleaner for both of us." They also discussed any possible impediments to the burglary, such as an alarm system or other household residents or neighbors who might complicate the situation, and Appellant provided detailed information to Seagler about the alarm system and about the victim.

The recorded conversations contain no indication, whatsoever, that Appellant knew he was speaking with law enforcement, or that the true purpose of selling the items in his storage unit was to finance his legal prosecution of another matter as he testified at trial, rather than a murder.

If, as Appellant averred, he intended to use the money from the sale to hire an attorney, there would have been no need for secrecy, because hiring an attorney is a perfectly legal activity. Appellant's emphasis on using secretive communications, such as using notes rather than speech and holding his finger to his lips to silence

12

Seagler, makes it clear that he was planning something he did not want others to hear; those conversations and notes, along with other evidence presented at trial established the criminal nature of the plan and that Appellant solicited Seagler to kill Larson. The jury accordingly could have disbelieved Appellant's testimony and could have believed based on the evidence and reasonable inferences therefrom, that Appellant requested, commanded, or attempted to solicit another person to murder his intended victim for remuneration. Tex. Penal Code Ann. § 15.03(a); Tex. Penal Code Ann. § 19.03(a)(3). *See Ortiz v. State*, 93 S.W.3d 79, 88 (Tex. Crim. App. 2002).

Appellant's contention that he knew all along that he was speaking with the police is likewise unpersuasive, entitling the jury to disregard it. *Id.* Not only did the State discredit Appellant's testimony that he wrote a note about police involvement early in the investigation, but the idea that Appellant was "playing" Seagler for his and Pinyerd's financial benefit could reasonably have been found by the jury not to be credible, considering the risk involved and the minimal benefit realized. *Id.*

When evidence conflicts, we presume that the jury resolved the conflicts in favor of the verdict, if a rational trier of fact could do so. *See Edward,* 635 S.W.3d at 656. Because a rational trier of fact could have believed the State's evidence over Appellant's testimony, we will not disturb the jury's decision that Appellant solicited

13

Larson's capital murder. *Id.* at 655-56. Appellant attempted to refute the charges against him by claiming he merely played along with the murder for hire plan solely to get money from the State, and he claimed he did not approach Pinyerd, but that Pinyerd approached him to take advantage of the apparent opportunity to profit from a contemplated sale of automobile parts. The jury was not, however, bound to accept this testimony, and the jury could have rejected all of his testimony. *See Ortiz,* 93 S.W.3d at 88. Moreover, the jury could have concluded based on the evidence and logical inferences therefrom that Appellant "requested, commanded, or attempted to induce" Pinyerd to locate someone who would kill Larson for money. Tex. Penal Code Ann. § 19.03(a)(3). If the plan to kill Larson had been Pinyerd's idea, Pinyerd likely would not have alerted law enforcement authorities, as Arfele's testimony implied, so the jury could have inferred that Pinyerd's decision to cooperate with the investigation indicated that Appellant had made the indefensible request the State alleged. In short, the jury, making its permissible logical inferences from the evidence before it, was justified in finding that Appellant solicited Pinyerd to find someone who would commit the intended murder. We overrule Appellant's sole point on appeal.

## IV. Conclusion

Because the State proved beyond a reasonable doubt that Appellant solicited Pinyerd to locate someone who would kill Larson for remuneration, sufficient

14

evidence supports Appellant's conviction of solicitation to commit capital murder.

We affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on August 12, 2022
Opinion Delivered September 7, 2022
Do Not Publish

Before Golemon, C.J., Kreger and Johnson, JJ.