NO. 12-02-00140-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


THOMAS HOLTON,
§
 APPEAL FROM THE 114TH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 SMITH COUNTY, TEXAS

 

MEMORANDUM OPINION


 Thomas Holton ("Appellant") was convicted of felony driving while intoxicated. A jury
sentenced him to ten years of imprisonment and imposed a $5,000 fine. In one issue, Appellant
contends that the evidence was factually insufficient to support his conviction. We affirm.


Background

 On August 19, 2001, Appellant was arrested for driving while intoxicated (1) in Tyler, Texas. 
After pleading "not guilty" to the offense, Appellant elected to have a jury decide his guilt or
innocence. The jury was chosen on March 18, 2002, and the presentation of evidence began on
March 19.

 The State first called Eddie Sheffield ("Sheffield"), a Tyler Police Department detective, to
testify. Sheffield told the jury that sometime between 9:00 and 9:30 a.m. on August 19, 2001, he
was driving northbound on Broadway Avenue on his way to church with his family. At the time,
Sheffield was not on duty. As he was traveling on Broadway, Sheffield noticed a black "sports car"
in front of him, also traveling north on Broadway but in the middle turn lane, weave into oncoming
traffic at least two times. Sheffield observed that "at least a quarter to a half" of the sports car had
veered over into the left southbound lane. Sheffield continued to follow the sports car and noticed
that while it was traveling in the center turn lane, its front and back left tires veered into oncoming
traffic in the left southbound lane. At the intersection of Rice, Shiloh and Broadway, Sheffield
moved over into the middle lane as he passed the vehicle traveling north. As Sheffield passed the
vehicle, he observed that the driver was a white male and was wearing a light-colored shirt. 
Sheffield also noticed that the driver continued to travel in the center turn lane. Just north of the
intersection of Rice, Shiloh and Broadway, the vehicle entered the inside lane for northbound traffic. 
At this time, Sheffield was traveling in the center lane about three or four car lengths ahead of the
sports car. 

 As the two vehicles approached the intersection of Independence and Broadway, Sheffield
looked at his side mirror and noticed that the sports car was veering toward his vehicle. Sheffield
had to make an abrupt evasive action to the right in order to avoid a collision. The sports car
continued north to the intersection of Broadway and Loop 323, where it stopped at a red light. At
that point, Sheffield thought he "had to do something" because he thought "this guy is probably
drunk." Sheffield drove up behind the sports car, placed a call to 911 on his cell phone and told the
dispatcher that he needed a marked patrol unit to initiate a traffic stop on the sports car because he
believed that the driver was intoxicated. Sheffield also gave the dispatcher a description of the
driver, a description of the vehicle, the license plate number, the location of both vehicles, and the
direction the vehicles were traveling.

 After the light turned green, Sheffield observed at least half of the sports car cross over the
line separating the southbound left turn lane from the northbound inside lane, into the path of a
vehicle traveling southbound. As the sports car was traveling over the line, Sheffield noticed the
sports car abruptly jerk back to the right and increase its speed, still traveling northbound. Sheffield
continued to follow the sports car northbound on Broadway and observed the vehicle drift "back and
forth" in its lane. At the intersection of Amherst and Broadway, Sheffield watched the sports car
make an abrupt left turn onto Amherst. Sheffield, continuing to follow the sports car at a distance,
also made a left turn onto Amherst, (2) heading west. As the sports car approached the intersection of
Amherst and Old Bullard Road, Sheffield noticed that the light at that intersection was red. Instead
of stopping at the intersection for the red light, the driver of the sports car continued through the
intersection. As the car went through the intersection, Sheffield observed that the vehicle was going
"too fast." He came to this conclusion because as the vehicle was crossing the intersection, it
"bottomed out," meaning that the bottom of the vehicle grazed the pavement as it went through the
intersection. The light turned green after the sports car ran the red light, and Sheffield drove through
the intersection, following the vehicle while talking on the phone to the dispatcher.

 Sheffield followed the sports car until it pulled into a residential driveway and stopped. The
driver of the vehicle went into the house. At that point, Officer Judy Thurmon ("Thurmon"), Officer
Weaver and Officer Parrish arrived at the residence in marked patrol cars. Sheffield briefed the
officers on what he had witnessed, and the officers then went to the house and requested to see the
person who had just arrived in the sports car. As the driver emerged from the house, Sheffield
identified Appellant as the person he observed driving the car that morning. When Appellant came
out of the house, Officer Thurmon began asking him some questions. Sheffield remembered
Appellant telling Thurmon that he had been drinking and that he thought his girlfriend was following
him. 

 After talking briefly with Appellant, Officer Thurmon asked Appellant to perform some field
sobriety tests. Sheffield remembered that when Appellant was asked to recite the alphabet, he could
not correctly perform that test. Sheffield could also smell the odor of an alcoholic beverage on
Appellant's breath, even while standing about ten feet away. Sheffield did not watch all of the
sobriety tests because he went back to his vehicle. Based on his prior experience dealing with
intoxicated drivers, Appellant's driving characteristics, his performance on the sobriety tests, the
odor of an alcoholic beverage on Appellant's breath, and Appellant's admission that he had been
drinking, Sheffield believed that Appellant was intoxicated and that Appellant's driving was
dangerous.

 On cross-examination, Sheffield testified that it was possible for people to drive recklessly
or erratically without being intoxicated. He also said that he remembered Appellant telling Thurmon
that he had been drinking earlier the night before; however, Appellant did not admit to drinking that
day. Sheffield admitted that alcohol itself does not have a smell and that he could not determine the
type of alcoholic beverage he believed Appellant had been drinking.

 The State then called Thurmon, a twenty-three-year veteran of the Tyler Police Department,
to testify about her observation of the events that transpired after she arrived at the residence. After
Sheffield briefed Thurmon on what he had witnessed, Thurmon knocked on the door and asked to
see the man who had just gone into the house. Appellant came out of the house, and Sheffield
identified Appellant as the person who had been driving the sports car. After Thurmon told
Appellant why she was talking to him, Appellant told her that he thought his girlfriend was following
him. As Appellant was speaking, Thurmon smelled "an odor of alcoholic beverage" on his breath
but could not tell what type of beverage it was. She also noticed that Appellant's eyes were "red and
watery," he had "slurred speech," and "his clothes were messed up." Appellant also told Thurmon
that he had been drinking. At that point, Thurmon asked Appellant to perform another field sobriety
test. Thurmon told the jury that Appellant began to do the "nine-step walk-and-turn" test before she
finished telling him the instructions, and that he made four attempts to begin the test before she
finished instructing him on how to do the test. One of the instructions was not to begin the test until
Thurmon had told him to begin. When Appellant performed the test, Thurmon testified that he "did
not put his feet heel to toe, he used his arms to balance, and he did not make the turn correctly." The
fact that Appellant had to use his arms for balance and did not turn correctly indicated to Thurmon
that Appellant failed the test and yielded clues that Appellant was intoxicated. 

 In order to rule out other causes of Appellant's failure to correctly perform the "nine-step
walk-and-turn" test, Thurmon asked Appellant to perform another test. As Thurmon was instructing
Appellant how to perform the next test, she noticed that Appellant was "real unsteady and swaying"
and that he "kept leaning back against the car kind of to help hold himself up or still." 

 Appellant next attempted to perform the "one-leg stand" test. Thurmon noticed that as
Appellant was doing this test, he counted to "five, put his foot down, picked it back up, and then he
counted to ten." One of the instructions Thurmon gave Appellant in performing this test was to
count by "one thousands." Thurmon testified that Appellant did not follow this instruction.
Appellant's performance on this test indicated to Thurmon that his balance was unsteady and that
he could not pass the test. 

 Thurmon then told Appellant to say his "ABC's." Appellant recited the alphabet correctly
until he got to the letter "J," where he next said "C," then "L." Thurmon testified that he finished
the rest of the letters correctly. After Appellant attempted to recite the alphabet, Thurmon performed
the "horizontal gaze nystagmus" ("HGN") test on Appellant. As she performed this test, she noticed
that Appellant did not have "smooth pursuit" in his eyes; instead, he had "bouncing" in his eyes. 
Thurmon told the jury that out of six possible clues for intoxication from the HGN test, Appellant
exhibited five of them. After Thurmon performed the HGN test, she placed Appellant under arrest
for driving while intoxicated and took him to the Smith County Jail.

 At the jail, Thurmon had Appellant perform the battery of tests a second time in order to
record the results on videotape. After Appellant's second performance of these tests, Thurmon still
believed that he was intoxicated and that the intoxication was due to the consumption of alcohol. 
Thurmon then asked Appellant to submit a sample of his breath for blood alcohol content analysis,
but Appellant refused. 

 On cross-examination, Thurmon admitted that a determination by an individual officer that
someone is intoxicated is subjective and is solely based on that officer's opinion. She also admitted
that when she detects the odor of an alcoholic beverage on a person's breath, she cannot determine
how many alcoholic beverages that person has consumed. Thurmon agreed that Appellant's
statement that he had consumed "some drinks the night before" was not written into her report of
the events that took place. She further admitted that during the "nine-step walk-and-turn" test, she
did not know how far apart Appellant's heel and toe were while he was performing that test. 
Thurmon also testified that the HGN test was not, by itself, conclusive evidence that a person was
intoxicated. 

 The State next called Susan Parrish ("Parrish"), a thirteen-year veteran of the Tyler Police
Department, to testify about the events she witnessed on the morning of August 19, 2001. She told
the jury that she arrived at the residence as Thurmon was leading Appellant out of the house. When
she walked up to the house, Appellant began to perform the sobriety tests. Parrish observed
Appellant sway while he was talking to Thurmon and then saw him lean back against a car. She also
watched as Appellant started the test "several times" before Thurmon finished instructing him on
how to perform the tests. As Appellant started the "nine-step walk-and-turn" test, Parrish saw that
Appellant was "holding his arms out a little bit as he's swaying and not walking heel to toe" but was
"walking normal steps." Parrish turned and walked away after she watched that test. In her opinion,
Appellant failed that sobriety test. She also testified that Appellant "had the appearance of
somebody who had been drinking," had the "odor," and his appearance was "disheveled, with his
clothing stained and dirty and wrinkled, like he had been wearing them for quite some time." Parrish
said that at that time, she did not have enough information to determine whether or not Appellant
was intoxicated. After Parrish testified, the State rested.

 The defense's sole witness was Don Talley ("Talley"), the owner of the residence that
Appellant drove to after being followed by Sheffield. Talley testified that Appellant had been at his
house the entire night before August 19. Talley said that Appellant left the residence that morning
for "about 15 or 20 minutes" before he came back. He told the jury that Appellant came over
sometime after dark and that, to his knowledge, Appellant had not been drinking prior to his arrival
at Talley's home. Talley also testified that he did not "have anything to drink" at his house and that
when he woke up the morning of August 19, Appellant was asleep on the sofa. To Talley's
recollection, Appellant did not have anything to drink at Talley's home from the time he arrived the 
night before to the time he left the next morning. When Appellant arrived back at Talley's house,
Talley could not smell any alcohol on Appellant and did not notice any signs of intoxication. In
Talley's opinion, Appellant was not intoxicated that morning.

 After Talley testified, the defense rested and both parties closed. The jury returned a guilty
verdict, sentenced Appellant to ten years of imprisonment and imposed a $5,000 fine. In one issue,
Appellant challenges the factual sufficiency of the evidence to support his conviction. 


Factual Sufficiency of the Evidence

 When reviewing the factual sufficiency of the evidence, we must ask whether a neutral
review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is
so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt,
although adequate if taken alone, is greatly outweighed by contrary proof. Ortiz v. State, 93 S.W.3d
79, 87-88 (Tex. Crim. App. 2002); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). We
will reverse the fact finder's determination only if a manifest injustice has occurred. King v. State,
29 S.W.3d 556, 553 (Tex. Crim. App. 2000). This review must employ appropriate deference to
prevent an appellate court from substituting its judgment for that of the fact finder, and any
evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight
and credibility to be given to the testimony of the witnesses. Jones v. State, 944 S.W.2d 642, 648
(Tex. Crim. App. 1996).

 A person commits the offense of driving while intoxicated if he operates a vehicle while
intoxicated in a public place. Tex. Pen. Code Ann. § 49.04 (Vernon Supp. 2003). A person is
intoxicated when he does not have the normal use of his mental or physical faculties by reason of
the introduction of alcohol into the body. Tex. Pen. Code Ann. § 49.01(2)(A) (Vernon Supp. 2003).

 The evidence in the case demonstrates that on the morning of August 19, 2001, Appellant
was driving extremely erratically and was a danger to himself and others. Shortly after Appellant
exited his vehicle, he was subjected to various sobriety tests, all of which he failed. Thurmon
testified that Appellant's eyes were "red and watery" and that Appellant had difficulty standing up
because he was swaying while she talked to him. Appellant admitted that he had been drinking, and
two of the three officers who were close in proximity to Appellant smelled the odor of alcoholic
beverages emanating from him. In both Sheffield's and Thurmon's opinions, Appellant was
intoxicated. A careful neutral review of all of the evidence in the instant case, both for and against
the finding that Appellant operated his vehicle in a public place while intoxicated, does not
demonstrate that the proof is so obviously weak as to undermine confidence in the fact finder's
determination. To the extent that Talley's testimony that Appellant was not intoxicated may be
viewed as contradictory, we note that a decision is not manifestly unjust merely because the fact
finder resolved conflicting views of the evidence in favor of the State. See Cain v. State, 958
S.W.2d 404, 410 (Tex. Crim. App. 1997). 


Conclusion

 The evidence adduced by the State was factually sufficient to support Appellant's conviction. 
Based on Sheffield's and Thurmon's observations and opinions, the jury was free to resolve the
conflicting evidence regarding whether or not Appellant was intoxicated in favor of the State. 

 The judgment of the trial court is affirmed.




 SAM GRIFFITH 

 Justice

 


Opinion delivered April 23, 2003.

Panel consisted of Worthen, C.J., and Griffith, J.





























(DO NOT PUBLISH)
1. In the instant case, the driving while intoxicated charge was enhanced to a felony because Appellant had
two prior convictions for driving while intoxicated, both of which were stipulated at trial. See Tex. Pen. Code Ann.
§ 49.09(b) (Vernon Supp. 2003).
2. After the intersection of Amherst and Old Bullard Road, Amherst becomes Sunnybrook Drive.