

**NUMBER 13-07-721-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

GABRIEL BARBOZA,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                Appellee.

**On appeal from the 347th District Court of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Justice Yañez**

A jury found appellant, Gabriel Barboza, guilty of murder[1] and aggravated assault.[2]

The trial court assessed punishment at fifty years for the murder and twenty-five years for

the aggravated assault.  In a single issue, appellant contends the evidence is factually

---

[1] *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2003).  Each offense was enhanced by a prior felony
conviction.

[2] *See id.* § 22.02 (Vernon Supp. 2007).

insufficient to support his convictions.  We affirm.

## Background

Officer Tommy Cabello, a Corpus Christi police officer, testified that around 9:00 p.m. on the evening of May 13, 2006, he responded to a call that shots had been fired at a nearby intersection.  When Officer Cabello pulled into the parking lot of a convenience store located at the intersection, he saw a car with bullet holes in the passenger-side window and door.  A man, later identified as Juan Hernandez, was sitting in the front passenger seat, bleeding heavily from a leg wound.  A second shooting victim, later identified as Rey Ybarra, was laying on the ground in front of the store's front entrance.  Ybarra later died from injuries sustained in the shooting.  Before emergency medical personnel arrived, Hernandez—who Officer Cabello described as "scared" because "he did not want to die"— told Officer Cabello he did not know who had fired the shots, but that the suspect vehicle was a Ford Expedition.

Officer Rogiberto Montejano testified that he and his partner, Officer Parker, arrived at the scene either first or about the same time as Officer Cabello.  As Officer Parker interviewed Hernandez, Officer Montejano heard Hernandez say that he knew who shot him, but could not recall the name.  According to Hernandez, the officers "had the name on file" because the shooter had stabbed Hernandez in an earlier altercation.[3]

James Ross testified that he and his wife were in a vehicle, in the left-hand (inside) lane stopped at the intersection.  The Ross car was the first car stopped at the intersection; there were other cars behind them and in the outside lane to their right.  Ross testified he

---

[3] It was later determined that there was no police report on file involving the stabbing Hernandez referred to.

2

heard five or six gunshots. A few seconds later, the car immediately behind Ross pulled out to the left (into the oncoming traffic lane), ran the red light crossing the intersection, and pulled into the convenience store parking lot. Ross testified he did not notice any other cars speeding away, and did not notice where any of the cars in the outside lane went.

Michael Ketchum testified that he heard the gunfire as he was leaving a nearby grocery store. He saw an Expedition leaving the intersection at a high rate of speed.

Detective Cody Harrison, an investigator with the gang unit, testified that he interviewed Hernandez at the hospital. Harrison testified that Hernandez said that appellant shot him. According to Harrison, sometimes interviewees were "more forthcoming" and spoke more freely to gang investigators than to other officers.

Hernandez testified that he and Ybarra (who was driving) were stopped at the intersection when Ybarra, indicating the car to their right, said, "there is that Puto that stabbed you."[4] Hernandez looked and saw appellant, who was driving the Expedition, gesturing towards him. Hernandez reclined the front passenger seat, rolled down the back rear window,[5] and started arguing with appellant. After some "arguing back and forth," appellant "just started shooting." Hernandez was hit twice in his leg, and Ybarra was hit several times in his chest and stomach area. According to Hernandez, Ybarra could not go forward because the car in front of his was still waiting for the light to change. Ybarra reversed the car, pulled out to the left, ran the red light, and pulled into the convenience store parking lot. Hernandez testified that although he did not see the Expedition turn right

---

[4] "Puto" is a Spanish slang derogatory term.

[5] Both front windows were locked in the "up" position and could not be lowered.

3

at the intersection, he assumes it did.[6]  Hernandez testified that when he was being treated at the hospital, he told a police officer that appellant shot him and described the vehicle he was driving.  Hernandez said that he was shown a six-person line-up, and that he picked appellant out of the line-up.  Hernandez also identified appellant's tattoo.  On cross-examination, Hernandez said that although he was unable to identify who had stabbed him at the time of the stabbing incident, he and Ybarra had since learned that appellant had stabbed him from "word on the street."  At trial, Hernandez identified appellant as the person who shot him.

Appellant testified at trial and denied shooting Ybarra and Hernandez.  According to appellant, he was out of town and did not own a car at the time of the shooting.  Appellant testified that he knew Ybarra and Hernandez, and that he had been involved in the earlier fight; he denied, however, that he had stabbed Hernandez in the fight.  On cross-examination, appellant admitted that when he heard there was a warrant for his arrest in this case, he avoided arrest by staying with a friend in the Rio Grande Valley for several months.

**Standard of Review and Applicable Law**

We measure the factual sufficiency of the evidence in a jury trial by the elements of the offense as defined by a hypothetically correct jury charge.[7]  In determining the factual sufficiency of the elements of the offense, we view all the evidence in a neutral light

---

[6] An aerial photo at trial established that there were only two driving lanes at the intersection; there was no left-turn lane and no right-turn-only lane.  There was, however, an unpaved shoulder to the right.  On cross-examination, Hernandez said he was not "just assuming," but that he saw the Expedition turn right.

[7] *See Grotti v. State*, No. PD-134-07, 2008 Tex. Crim. App. LEXIS 761, at *16 (Tex. Crim. App. June 25, 2008); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd).

4

to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt.[8] We set aside a finding of guilt only if the evidence supporting the verdict is so weak that the jury's verdict is clearly wrong and manifestly unjust or when the great weight and preponderance of the evidence is contrary to the verdict.[9] A proper factual sufficiency review must consider the most important evidence that the appellant claims undermines the jury's verdict.[10]

The jury, as the trier of fact, is the exclusive judge of the credibility of witnesses and the weight to be afforded their testimony.[11] The jury is free to believe one version of the facts and reject another.[12] It is also entitled to accept or reject all or any portion of a witness's testimony.[13] We are authorized to disagree with the fact finder's determination only when the record clearly indicates our intervention is necessary to stop the occurrence of a manifest injustice.[14]

In order to prove that appellant committed the offense of murder under section 19.02(b) of the Texas Penal Code, as alleged in the indictment, the State had to prove that (1) appellant (2) caused the death of Rey Ybarra (3) by shooting Ybarra with a gun (4) with

---

[8] *See Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006).

[9] *Id*. at 415.

[10] *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

[11] TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).

[12] *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981).

[13] *Id*.; *Ozuna*, 199 S.W.3d at 605.

[14] *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000).

either (a) intent to cause Ybarra's death or (b) intent to cause Ybarra serious bodily injury and committing an act clearly dangerous to human life.[15]

A person acts intentionally when it is his conscious objective or desire to engage in the conduct or cause the result.[16] A person acts knowingly when he is aware that his conduct is reasonably certain to cause the result.[17]

Intent is a question of fact that is within the sole purview of the jury; the jury may rely on its collective common sense and apply common knowledge and experience.[18] Intent may be inferred from the circumstantial evidence surrounding the incident including the acts, words, and conduct of the accused.[19] Moreover, the jury may infer the intent to kill from the use of a deadly weapon unless it would be unreasonable to infer that death or serious bodily injury could result from the use of the weapon.[20] The Texas Penal Code defines a firearm as a deadly weapon.[21]

In order to prove that appellant committed the offense of aggravated assault under section 22.02 of the penal code, as alleged in the indictment, the State was required to prove that (1) appellant (2) intentionally, knowingly, or recklessly (3) caused bodily injury

---

[15] TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (Vernon 2003).

[16] *Id*. § 6.03(a) (Vernon 2003).

[17] *Id*. § 6.03(b).

[18] *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003).

[19] *Guevara v. State*, 152 S.W.3d 45, 50 ( Tex. Crim. App. 2004).

[20] *Mosley v. State,* 983 S.W.2d 249, 254-55 (Tex. Crim. App. 1998) (citing *Ross v. State*, 861 S.W.2d 870, 873 (Tex. Crim. App. 1992)).

[21] *See* TEX. PENAL CODE ANN. § 1.07(a)(17)(A) (Vernon Supp. 2007).

(4) to Juan Hernandez (5) by shooting Hernandez and (6) used or exhibited a firearm during the assault.[22]

## Discussion

Appellant's challenge to the sufficiency of the evidence to support his convictions is limited to the issue of identity. He argues that the only evidence identifying him as the shooter is Hernandez's testimony, and that such testimony is "too weak to support the verdict."

According to appellant, Hernandez's identification of him is not based on Hernandez's personal knowledge, but rather, on Hernandez's assumption, based on past events and the "word on the street." Appellant argues that at the scene of the crime, neither Ybarra nor Hernandez identified him as the shooter to the police. Appellant also asserts that Ybarra called his mother immediately after the shooting, but did not say who had shot him.[23]

Appellant also challenges Hernandez's testimony that Ybarra recognized appellant at the stop light. Appellant argues that it was dark, the front windows were tinted, and there would have been insufficient light for Ybarra to recognize appellant in such circumstances. Appellant argues that Hernandez's testimony as to where the Expedition went after the shooting is in "conflict" with Ross's testimony: Hernandez said the Expedition turned right, but Ross said he did not notice any cars passing on his right.

_____

[22] *See id.* § 22.02(a) (Vernon Supp. 2007).

[23] Ybarra's mother testified that she learned her son had been shot when she received a phone call from her son's girlfriend. The assertion that Ybarra called his mother came from Hernandez, who saw Ybarra using his cell phone. However, Hernandez was approximately fifteen feet away from Ybarra and did not hear the conversation.

7

Appellant argues that the police were unable to connect him to an Expedition. He also argues that the path of the wound to Ybarra's right arm was "horizontal," which is "inconsistent with a shot being fired from a position higher than the target." Finally, appellant contends that the shots were not fired at Hernandez because Hernandez was looking out the rear passenger window and the shots were directed to the front passenger side of the vehicle. We address appellant's arguments in turn.

As to appellant's argument that Hernandez's identification of him was based on an "assumption," and not "personal knowledge," we disagree. Regardless of what Hernandez believed about whether appellant had stabbed him in the earlier fight, Hernandez positively identified appellant at trial ("[n]o doubt in my mind") as the person who fired the shots. Hernandez also testified that he identified appellant by his tattoo and picked him out of a six-person line-up.

As to appellant's contention that Hernandez did not identify appellant to police at the scene of the crime, Hernandez testified that at the hospital, he asked to speak to a police officer and told the officer that appellant was the shooter. Appellant stated, "I told [the officer at the hospital] to contact [the detective who investigated the stabbing] because this was to regards to [sic] Barboza. That's who it was. I told him who it was. I told him what he was driving." Detective Harrison confirmed Hernandez's testimony by stating he had interviewed Hernandez at the hospital and that Hernandez said appellant had shot him. Harrison also noted that he was sent to the hospital as a gang investigator, and that people questioned by the gang investigators often spoke more freely with investigators than with other police officers.

With regard to appellant's argument that Ybarra could not have identified him

8

because it was dark and Ybarra was looking through the front tinted windows, we note that Hernandez stated on cross-examination that it was "very bright" because there is a light at the corner of the intersection. Hernandez also stated that they always rode "with the seats laid back," and that he leaned back, and began arguing with appellant. When asked who he saw in the car, Hernandez stated, "I saw Barboza and that Expedition."

We are also unpersuaded that Hernandez's testimony that the Expedition turned right is in conflict with Ross's testimony that he did not see any vehicles passing on the right. Ross testified that after the shots were fired and Ybarra's vehicle pulled around and through the intersection, he "went straight" and "said we are out of here because I know what I heard." Ross stated he "did not see any vehicles speed away because of my car being so low to the ground and other vehicles to the right of me, I can't tell what was on the other side of those vehicles." We conclude Ross's testimony is not inconsistent with Hernandez's testimony or Ketchum's testimony that the Expedition left the scene.

Appellant argues that the "horizontal" trajectory of the gunshots is inconsistent with the shots being fired from an Expedition, which would place the shooter higher than Ybarra's vehicle. However, Dr. Ray Fernandez, a Nueces County medical examiner that performed an autopsy on Ybarra, testified that the overall direction of the gunshot wounds was "right to left and downward." When asked if the gunshot "started higher than it ended up," Dr. Fernandez stated, "[t]hat's correct." Specifically, Dr. Fernandez was asked:

> Q [the State]: Based on what you observed in the wound track, would you say that what you saw was consistent with this man being shot from his right side, from someone sitting slightly higher than him, consistent with him being the driver of a sedan type vehicle being shot by someone in a higher level SUV?
>
> A [Dr. Fernandez]: Someone to his right somewhere, that's correct.

Finally, appellant argues that Hernandez's testimony that he was exchanging words with appellant by looking out the rear passenger window is inconsistent with the gunshots being directed at the front passenger side rather than Hernandez. We disagree. Officer Cabello testified there were two shots in the passenger side window and two in the passenger side door. When asked if the Expedition was "right up besides you," Hernandez testified it was "a little bit off" or "offset." We do not find the bullet holes in the passenger side window and door inconsistent with Hernandez's testimony.

We again note that the jury was free to accept or reject all or any portion of a witness's testimony.[24] We may not substitute our own determination for that of the jury.[25] Based on the record evidence, we conclude the jury could have rationally found that appellant shot Ybarra and Hernandez. Viewing the evidence under the proper standard, we conclude it is factually sufficient to support appellant's convictions for murder and aggravated assault. Appellant's sole issue is overruled.

**Conclusion**

We affirm the trial court's judgment.

LINDA REYNA YAÑEZ,
Justice

Do not publish. TEX. R. APP. P. 47.2(b).
Memorandum Opinion delivered and
filed this the 29th day of August, 2008.

---

[24] *Penegraph*, 623 S.W.2d at 343; *Ozuna*, 199 S.W.3d at 605.

[25] *Ortiz v. State*, 93 S.W.3d 79, 87-88 (Tex. Crim. App. 2002).