**Opinion filed March 20, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00067-CR

_____

## LARRY DALE SMITH, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from 104th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 18117B**

## M E M O R A N D U M   O P I N I O N

The jury convicted Larry Dale Smith of aggravated assault of a public servant with a deadly weapon. Appellant pleaded true to two enhancement allegations. The jury found the enhancement allegations to be true and assessed Appellant's punishment at confinement for thirty years. In three issues, Appellant contends (1) that the trial court erred when it admitted extraneous offense evidence

against him, (2) that he was denied effective assistance of counsel, and (3) that the evidence was insufficient to support his conviction. We affirm.

*Background*

The evidence at trial showed that six officers of the Abilene Police Department went to a residence after receiving information that Appellant was there. The officers took a trained police canine with them. The officers sought to make contact with Appellant because he was the subject of two felony warrants for evading arrest. Sergeant Jason Haak, Sergeant Ken Robinson, and Detective Joel Harris approached the front of the residence, while the remaining three officers and the canine approached the house from the rear. As the officers approached the front of the residence, a dog began to bark, and Appellant opened the front door and looked outside. The officers shined their flashlights at Appellant and identified themselves. Appellant, knowing it was the police, immediately slammed the door shut and ran in the opposite direction toward the back of the residence. The officers kicked in the front door and chased Appellant to the back door, where a physical struggle ensued between Appellant and the three officers.

Sergeant Haak testified that, when he entered the home, he ran past some people who were seated in the living room. Sergeant Haak entered the kitchen area, where he saw Appellant engaged in a physical struggle with the other two officers. Although the officers yelled at Appellant to stop resisting, he did not. Sergeant Haak testified that Appellant, while holding a large knife in his hand, stepped toward him and that Appellant slashed at his face with the knife. Sergeant Haak said that he had to lean back to avoid being contacted with the knife and that Appellant missed slashing his face by a small margin. As Sergeant Robinson grabbed Appellant by the hand that was holding the knife, Sergeant Haak drew his firearm, intending to shoot Appellant. But Sergeant Haak could not shoot because he did not have a clear shot, and the knife eventually came

loose from Appellant's hand and fell to the floor. Sergeant Haak testified that he had no doubt that Appellant swung the knife at him, that he perceived Appellant's actions as a threat, and that the knife was capable of causing death or serious bodily injury in the manner in which Appellant used it.

After the knife fell to the ground, the back door somehow came open, and Appellant escaped Sergeant Robinson's grasp and ran outside. Sergeant Haak exited the residence behind Appellant and saw other officers attempting to stop Appellant from escaping through a hole in a wood fence in the backyard. Sergeant Haak ran to Appellant and joined Officer Kevin Easley and his canine in their attempts to pull Appellant back through the fence. Throughout the encounter, the officers repeatedly commanded Appellant to stop resisting and told him that he was under arrest. After the officers pulled Appellant back through the fence, Sergeant Haak heard another officer yell "gun" and saw Appellant holding a small Derringer pistol in his right hand. The struggle intensified, and Officer Easley drew his firearm and put it to the back of Appellant's head. With Officer Easley on Appellant's back, and after Appellant failed to respond to multiple commands, Sergeant Haak pulled out his Taser and used it twice on Appellant. Appellant yelled in pain but continued to resist. Eventually, however, the officers were able to secure the Derringer, to handcuff Appellant, and to take him into custody.

Sergeant Robinson testified that he was the first officer inside the residence after he kicked in the door. Sergeant Robinson followed closely behind Appellant as he fled and saw Appellant grab a knife from somewhere in the vicinity of the kitchen counter. Sergeant Robinson made contact with Appellant near the back door, grabbed him by the arm, and yelled at him to "stop" and to drop the knife. As Sergeant Robinson grabbed Appellant's arm, Appellant stepped out and swiped the knife at Sergeant Haak, who was standing right behind them.

Sergeant Robinson pushed Appellant and slammed his hand against the wall, causing him to drop the knife.

Sergeant Robinson testified that the encounter in the kitchen lasted seconds and that there was no question in his mind that Appellant threatened Sergeant Haak with a deadly weapon when he slashed with the knife. After the knife fell, Sergeant Robinson attempted to secure Appellant, but Sergeant Robinson fell down and Appellant escaped through the back door. Sergeant Robinson followed Appellant outside and met him at the fence. The canine already had ahold of Appellant. The officers shouted commands at Appellant and fought with him in an effort to get him back through the fence. Sergeant Robinson saw a gun under Appellant and continued to position himself in an effort to pull Appellant back through the fence. The officers secured the gun shortly after Sergeant Haak used his Taser on Appellant. Sergeant Robinson testified that Appellant remained combative after he was taken into custody.

Detective Harris testified that he entered the residence behind Sergeant Robinson and that, upon entering the living room, he saw Appellant facing the back door and holding a knife. Sergeant Robinson was holding Appellant's arm at the time. Detective Harris was positioned where his vision was blocked by Sergeant Robinson. As such, Detective Harris could not see whether Appellant swiped with a knife, but Detective Harris heard the other officers command Appellant to drop the knife. Detective Harris said the knife was in Appellant's hand from the time he first saw Appellant until Appellant dropped it and ran out the back door.

Detective Harris followed Appellant out the back door and saw Appellant trying to crawl through a hole in the fence. Detective Harris joined the other officers in their attempts to pull Appellant back through the fence; he testified that the struggle was very brief but that Appellant was very persistent in his attempt to

4

get away. At some point, Detective Harris saw the hammer of a small pistol under Appellant and yelled "gun" to alert the other officers. Detective Harris grabbed Appellant by the hand in which he held the gun and commanded Appellant to drop it. After Sergeant Haak used his Taser on Appellant, the officers were able to pry the gun loose from Appellant. After Appellant let go of the gun, the officers took him into custody, and Detective Harris transported him to jail. Appellant was belligerent and acted aggressively throughout the encounter.

Officers Anthony Joeris and Easley testified as to the events that occurred after Appellant fled the residence. They came into contact with Appellant at the hole in the fence. Essentially, their testimony corroborated the testimony of the other officers.

Appellant testified on his own behalf, and he presented testimony from three other witnesses who were inside the residence when the events in question occurred. Appellant said that he was visiting his friends, Angela Olszak and Bret Brewer, at the residence when he went to the door to make a dog stop barking. Appellant testified that, when he opened the front door, he saw the police. He then slammed the door and ran toward the back of the house in an effort to escape. According to Appellant, Olszak and Brewer kept a knife stuck inside the back door to keep it shut because the door did not have a latch or a knob and because the bolt lock on the door was broken. As Appellant approached the back door, he reached up with one hand to take the knife out of the door so that he could open the door and escape the residence. Appellant said that he did not look back at his pursuers. He said that he threw the knife down immediately after he felt an officer tug on his jacket.

Appellant testified that he intended to get out the back door to escape but that he did not intend to assault an officer. Appellant went out the back door and straight to the hole in the fence in the backyard. As soon as he dove through the

5

hole, Appellant felt the officers grab his feet and pull him back. Appellant said that, during the struggle, his jacket came up over his head and restricted his arms. He said that the gun fell out of his pocket after the officer used the Taser. Appellant said that he grabbed the gun in an effort to throw it away. Appellant further testified that he did not knowingly or intentionally threaten anyone.

Olszak testified that she lived in the residence and was present on the night in question. She said that she always kept a knife in the back door to keep it shut because the door did not have a latch or knob. She also said that, when the police came into the residence, they chased Appellant to the back of the house, and she heard someone yell, "[H]e's got a knife." Olszak testified that an officer said something about his hand being cut, but she did not think the knife could cut anything because it had been stuck in and pulled out of the door several times.

Brewer testified that he lived in the residence with Olszak and their son. Brewer said that he was coming out of the bathroom when the police officers kicked the door in and chased Appellant to the back of the house. Brewer said that he had a clear view of the back door and the struggle that ensued between Appellant and the officers. After Appellant and the officers ran by him, Brewer heard the police yell, "He's got a knife"; heard Appellant say, "Not no more"; and saw Appellant drop the knife immediately thereafter. According to Brewer, Appellant never swung the knife at any officer.

Ralph Johnston was sitting on the sofa in the living room when the police officers kicked the front door in and chased Appellant. Johnston testified that the back door of the residence had no knob or latch and that a knife was kept in the door to keep it shut. Johnston said that, when Appellant got to the back door, Appellant tried to pull the knife out of the door but was met by an officer. Johnston heard an officer say, "He's got a knife" and Appellant say, "Not

6

anymore." Johnston testified that Appellant never turned toward the officers or sliced the knife at any officer.

*Sufficiency of the Evidence*

In his third issue, Appellant challenges the sufficiency of the evidence to support his conviction. We review a sufficiency of the evidence issue under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). In conducting a sufficiency review, we defer to the jury's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. Each fact need not point directly and independently to the defendant's guilt, so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

The indictment alleged the following statutory elements of aggravated assault against a public servant: (1) Appellant; (2) intentionally or knowingly; (3) threatened Sergeant Haak with imminent bodily injury; (4) while exhibiting a

deadly weapon, to-wit: a knife; and (5) Appellant knew that Sergeant Haak was a public servant in the lawful discharge of his official duty. *See* TEX. PENAL CODE ANN. § 22.01(a)(2) (West Supp. 2013), § 22.02(a)(2), (b)(2)(B) (West 2011).

In aggravated assault cases, intent or knowledge may be inferred from the acts, words, and conduct of an accused at the time of the offense. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). A threat may be communicated by action, conduct, or words. *McGowan v. State*, 664 S.W.2d 355, 356 (Tex. Crim. App. 1984). A person acts intentionally with respect to his conduct when it is his conscious objective or desire to engage in the conduct. PENAL § 6.03(a). A person acts knowingly with respect to the nature of his conduct or to the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b).

The evidence established that, as the officers approached the front of the residence, Appellant opened the front door, saw the officers' flashlights, and then slammed the door shut and ran toward the back of the house. Appellant testified that he knew the police were there to get him and that his intent was to evade arrest. The officers went through the front door and chased Appellant to the back of the residence. The officers made contact with Appellant as he was taking a large knife out of the back door that kept the back door shut, and a struggle ensued. Sergeant Haak testified that Appellant ignored the officers' demands for him to stop resisting and to drop the knife. Sergeants Haak and Robinson both testified that, during the struggle, Appellant stepped toward Sergeant Haak and swiped the knife at him, coming very close to slicing his face. Sergeant Haak testified that he would have been cut in the face if he had not stepped back from Appellant, and Sergeant Robinson testified that there was no question Appellant threatened Sergeant Haak with a deadly weapon. The knife was admitted into evidence. The cumulative effect of the evidence establishes the required threat of imminent

bodily harm while exhibiting the knife as a deadly weapon. *See Fitzgerald v. State*, No. 11-04-00250-CR, 2006 WL 246277, at *5 (Tex. App.—Eastland Feb. 2, 2006, no pet.) (not designated for publication) (evidence was sufficient to establish threat of imminent bodily injury when defendant held and waved knives in a threatening manner in close proximity to victim).

Although defense witnesses testified that Appellant dropped the knife as soon as he removed it from the door and that he never swiped the knife at any officers, the jury was free to disbelieve their testimony and to give weight to the testimony of Sergeants Haak and Robinson. *See Clayton*, 235 S.W.3d at 778. After viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Appellant committed aggravated assault against Sergeant Haak, a public servant, with a deadly weapon. *See* PENAL §§ 22.01(a)(2), 22.02(a)(2), (b)(2)(B). Accordingly, the evidence was sufficient to support Appellant's conviction. We overrule Appellant's third issue.

*Admission of Extraneous Offense Evidence*

In his first issue, Appellant contends that the trial court erred when it admitted evidence of the events that occurred after he exited the back door of the residence because such evidence constituted inadmissible extraneous offense evidence under Rule 404(b) of the Texas Rules of Evidence. *See* TEX. R. EVID. 404(b). According to Appellant, this evidence was unrelated and irrelevant to the alleged aggravated assault with a knife, and the danger of unfair prejudice and confusion substantially outweighed the probative value of admitting it. The State asserts that the evidence was admissible as same transaction contextual evidence.

We review a trial court's decision to admit or exclude extraneous offense evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We will reverse a trial court's ruling that an

extraneous offense has relevance apart from proving conformity with the defendant's character only if the ruling is outside the zone of reasonable disagreement. *Id.* at 343–44. Likewise, we give deference to a trial court's determination that the probative value of the evidence is not outweighed by the danger of unfair prejudice. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

Under Rule 404(b), evidence of other crimes, wrongs, or acts is not admissible to prove character of a person in order to show action in conformity therewith. However, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *De La Paz*, 279 S.W.3d at 342–43. This list of exceptions to the general exclusionary rule is "neither mutually exclusive nor collectively exhaustive." *Id.* at 343. Thus, extraneous offense evidence may be admissible for purposes other than those expressly listed in Rule 404(b). *See id.* Such evidence may be admissible as same transaction contextual evidence, which has been defined as evidence of other offenses connected with the offense charged. *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000); *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993).

Same transaction contextual evidence may be admissible where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony . . . of any one of them cannot be given without showing the others." *Rogers*, 853 S.W.2d at 33. "[E]vents do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of that act so that it may realistically evaluate the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). As such, the facts and circumstances surrounding the commission of an offense are relevant and necessary for the jury to have a

complete picture of what occurred. *See Burks v. State*, 876 S.W.2d 877, 900 (Tex. Crim. App. 1994).

Here, the evidence of the conduct engaged in by Appellant after he exited the back door was so intertwined with the charged aggravated assault offense that the jury's understanding of the circumstances surrounding the charged offense would have been obscured without it. The evidence demonstrated that all of the events described by the officers occurred within seconds and constituted one continuous criminal episode. Thus, the jury had the right to hear evidence as to what occurred from the time police officers arrived at the residence to execute the felony warrants to the time they apprehended Appellant after he attempted to evade them.

Additionally, the evidence of events that occurred in the backyard, which included testimony about Appellant's attempt to escape from the officers and to flee the scene, was relevant to show Appellant's intent to commit the aggravated assault against Sergeant Haak in the residence. Appellant's defensive theory was that he never slashed the knife at Sergeant Haak or, in the alternative, that any slashing of the knife was an inadvertent and unintended result of Sergeant Robinson pulling Appellant's arm back. The evidence of Appellant's struggle with police that occurred outside after the alleged aggravated assault showed that Appellant was willing to use any means necessary to avoid apprehension. As such, the trial court's conclusion that the evidence had relevance apart from showing conformity with Appellant's character was not outside the zone of reasonable disagreement. Therefore, we hold that the trial court did not abuse its discretion when it allowed testimony regarding the events that led up to Appellant's apprehension in the backyard. Appellant's first issue is overruled.

*Allegations of Ineffective Assistance of Counsel*

In his second issue, Appellant contends that his trial counsel rendered ineffective assistance when he failed to object to the State's questioning of Appellant about two unadjudicated charges of evading arrest. Appellant further argues that his counsel's ineffectiveness caused him prejudice in light of the fact that Appellant's testimony opened the door for the State to present testimony from two officers who were involved in the underlying evading arrest charges.

To prevail on a claim of ineffective assistance of counsel, an appellant must establish that his lawyer's performance fell below an objective standard of reasonableness and that there is a "reasonable probability" the result of the proceeding would have been different but for counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Mallett*, 65 S.W.3d at 63. The purpose of this two-pronged test is to judge whether counsel's conduct so compromised the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. *Id.*

A review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within a wide range of reasonable professional assistance. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). The appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994); *Hayden v. State*, 155 S.W.3d 640, 648 (Tex. App.—Eastland 2005, pet. ref'd). An allegation of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

To succeed on a claim of ineffective assistance of counsel for failure to object, a defendant must demonstrate that the trial court would have committed error in overruling the objection if trial counsel had objected. *See Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996). Thus, the defendant must show that the evidence was inadmissible. *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002).

Appellant's claim of ineffective assistance directs us to the following exchange during his cross-examination:

Q: Why were you running?

A: Sir?

Q: Why were you running from the cops?

A: I didn't want to go to jail.

Q: Okay.

A: I was on the run for -- it's been -- it was over a month.

Q: Okay. What were -- a month since what?

A: Since my court date.

Q: Okay. Matter of fact, you were scheduled to go to trial for the felony offense of what?

A: Evading arrest.

Q: Evading arrest. You had a court date and --

A: And I didn't go. I didn't show up at it.

Q: Okay. Matter of fact, it was two cases of evading arrest?

A: Yes, it was. There's my MO.

13

Q: MO --

A: Not aggravated assault. Evading arrest.

Q: In a vehicle?

A: Yes.

Q: Running from the cops? Did you do those?

A: No. I'm innocent until proven guilty.

Q: Well, I'm asking you, did you do them?

A: No.

Q: It wasn't you?

A: No. What is this?

Q: I'm sorry?

A: I'm innocent until proven guilty on everything. I may be charged with it, but I'm not guilty. Just like I'm charged with this, I'm not guilty of it.

Q: I'm asking you, did you do it?

A: No.

Q: Was it somebody else in your truck?

A: Yes.

The State contends that this evidence was admissible. However, even if we assume that the extraneous offense evidence was inadmissible, Appellant has not demonstrated that his trial counsel rendered ineffective assistance. Appellant accurately states that his trial counsel admitted on the record that he made a

mistake by failing to object to the prosecutor's line of questioning regarding extraneous offenses. But proving ineffective assistance requires more than simply showing some mistake or default. *See Cannon v. State*, 252 S.W.3d 342, 348–49 (Tex. Crim. App. 2008). The complainant must also establish that the default was prejudicial. *Id.* Appellant has failed to do so here.

In a pretrial hearing on Appellant's motion in limine, the trial court concluded that the State could properly introduce evidence that the officers were executing felony warrants for Appellant's arrest for the two evading arrest charges to provide context for the officers' method of entry and use of police resources. This evidence was already before the court when the prosecutor cross-examined Appellant. The fact that the prosecutor asked Appellant whether he had committed the evading arrest offenses on which the warrants were based did not create a reasonable probability that the admission of such extraneous offense evidence could have affected the judgment of the jury, especially in light of Appellant's admission that he was attempting to run from the police during the incident that led to his aggravated assault charge in this case. Indeed, Appellant freely testified that his "MO" was to evade arrest rather than to commit aggravated assault. Thus, although Appellant's testimony opened the door to testimony by two officers involved in the collateral evading arrest charges, we cannot conclude that defense counsel's failure to object so compromised the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. Because Appellant has failed to establish prejudice, his claim of ineffective assistance of counsel must fail. *See Mitchell v. State*, 68 S.W.3d 640, 643–44 (Tex. Crim. App. 2002). We overrule Appellant's second issue.

*This Court's Ruling*

We affirm the judgment of the trial court.

JOHN M. BAILEY

JUSTICE

March 20, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.