

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-17-00595-CR

Christopher M. **HARBER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CR5166
Honorable Ron Rangel, Judge Presiding

Opinion by:    Luz Elena D. Chapa, Justice

Sitting:    Luz Elena D. Chapa, Justice
    Irene Rios, Justice
    Liza A. Rodriguez, Justice

Delivered and Filed: August 7, 2019

REVERSED AND RENDERED

Christopher Harber was convicted by a jury of criminally negligent homicide. Harber appeals the judgment, arguing the prosecution is barred by limitations and the evidence is legally insufficient to support the verdict. We hold Harber forfeited his limitations defense by failing to raise it in the trial court. However, we conclude the evidence is insufficient to establish criminally negligent homicide. We therefore reverse the judgment and render a judgment of acquittal.

## BACKGROUND

Harber was driving a mobile home hauler east on Interstate 10 on July 27, 2012, when he drove onto the right shoulder of the road and hit a tow truck driver. The tow truck driver, Travis Danner, died at the scene. In June 2016, Harber was indicted for manslaughter. The indictment alleged Harber recklessly caused the death of an individual by driving and operating a commercial vehicle without a valid driver's license or a valid commercial driver's license, driving and operating a motor vehicle at a speed that was not reasonable and prudent under the circumstances then existing, failing to apply the brakes in a timely and reasonable manner, failing to maintain a single lane of traffic, and driving on an improved shoulder.[1] Prior to the beginning of trial, the State, with the trial court's permission, amended the indictment by striking the allegation that Harber was "driving and operating a motor vehicle at a speed that was not reasonable and prudent under the circumstances then existing."

The case was tried to a jury in August 2017, more than five years after the accident. The jury was charged on manslaughter and the lesser-included offense of criminally negligent homicide. The jury found Harber guilty of criminally negligent homicide and found he used or exhibited a deadly weapon during the commission of the offense. Harber pled true to the repeat offender enhancement allegations, and the jury assessed punishment at fifteen years in prison. Harber timely appealed.[2]

---

[1] *See* TEX. CODE CRIM. PROC. art. 21.15 (requiring indictment to allege with specificity the act(s) relied upon to constitute recklessness or criminal negligence).

[2] Harber's first appointed appellate attorney filed a brief pursuant to *Anders v. California*, 386 U.S. 738 (1967). This court determined there was an arguable issue for appeal, granted counsel's motion to withdraw, and abated the appeal for appointment of new appellate counsel. *See Harber v. State*, No. 04-17-00595, 2018 WL 5268859 (Tex. App.—San Antonio Oct. 24, 2018, order) (mem. op., not designated for publication). The appeal was then rebriefed.

**STATUTE OF LIMITATIONS**

Harber argues the prosecution for criminally negligent homicide was time-barred and he should be allowed to raise his statute of limitations defense for the first time on appeal pursuant to the holding of *Phillips v. State*, 362 S.W.3d 606 (Tex. Crim. App. 2011). He contends the holding of *Ex parte Heilman*, 456 S.W.3d 159 (Tex. Crim. App. 2015), which overruled *Phillips* and held that a limitations defense lacking any *ex post* facto component may be forfeited by failing to invoke it, should not be applied retroactively because the holding "was unforeseeable . . . [and] would be procedurally burdensome and unjust."

The indictment filed in June 2016 charged Harber with manslaughter, alleging he recklessly caused Danner's death on July 27, 2012. There is no statute of limitation for manslaughter. TEX. CODE CRIM. PROC. art. 12.01(1)(A). At trial, the jury was charged on both manslaughter and the lesser-included offense of criminally negligent homicide. Criminally negligent homicide is a state jail felony and falls within the three-year limitation period for "all other felonies." *See id.* art. 12.01(7). A charge of criminally negligent homicide became limitations-barred in July 2015, almost a year before the indictment was presented in June 2016. Harber did not object to submission of the charge and did not assert a limitations defense at any time before trial, during trial, or in a post-judgment motion. The record does not reflect whether Harber or the State requested the charge on the lesser-included offense.

In *Heilman*, the Texas Court of Criminal Appeals held "a statute-of-limitations defense lacking any *ex post facto* component . . . is merely a procedural 'act of grace' by the legislature that can be forfeited." 456 S.W.3d at 168 (citing *Proctor v. State*, 967 S.W.2d 840, 843 (Tex. Crim. App. 1998)). In so doing, it reaffirmed its 1998 decision in *Proctor v. State* that the statute of limitations is not jurisdictional and is not an absolute, systemic requirement; rather, it creates a defense that must be implemented upon request and is forfeited if not asserted at or before trial.

*See Heilman*, 456 S.W.3d at 168-69; *Proctor*, 967 S.W.2d at 844.  The court in *Heilman* also overruled its 2011 decision in *Phillips v. State*, which held only limitations defenses that require factual development beyond the charging instrument are forfeited by failing to assert them at trial; whereas, limitations defenses based on "pure law"—ones that are apparent on the face of the charging instrument—give rise to an absolute bar to prosecution that may be raised at any time. *Heilman*, 456 S.W.3d at 162-64.

Harber argues *Heilman* should not be applied retroactively and the rule announced in *Phillips* should apply because it was in effect at the time of the accident.  He contends that pursuant to *Phillips* the prosecution for criminally negligent homicide was absolutely barred without him needing to raise the defense because it was a "pure law" limitations defense.  Harber argues retroactive application of *Heilman*'s procedural default holding to him is an *ex post facto* violation and a violation of his due process rights.  We disagree.

Generally, "[o]nly the legislature can violate either the federal or state *Ex Post Facto* Clauses because . . . both are 'directed at the Legislature, not the courts.'"  *Id.* at 163 (quoting *Ortiz v. State*, 93 S.W.3d 79, 91 (Tex. Crim. App. 2002)).  In assessing a claim of an *ex post facto* violation, "we look beyond the actor that is directly committing the alleged violation for some legislative origin of the alleged violation."  *Id.* at 165.  There was no legislative *ex post facto* component to Harber's limitations defense because no legislative act purported to authorize or revive the otherwise time-barred prosecution for criminally negligent homicide.  *See id.* at 168-69. Harber does not point to any legislative origin of the alleged *ex post facto* violation.  Rather, the source of Harber's time-barred conviction is his forfeiture of the defense pursuant to a rule of

procedural default that is of judicial, not legislative origin.[3]  *See id.* at 165; *Proctor*, 967 S.W.2d at 845.

Although the *Ex Post Facto* Clause does not apply to judicial actions, an unforeseeable judicial construction of a criminal statute, applied retroactively, can function like an *ex post facto* law and violate the Due Process Clause.  *See Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964); *Heilman*, 456 S.W.3d at 166.  "If a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, it must not be given retroactive effect."  *Bouie*, 378 U.S. 354 (quotation omitted).  However, this due process limitation is not coextensive with the *ex post facto* prohibition.  *See Rogers v. Tennessee*, 532 U.S. 451, 459 (2001).  The due process limitation is rooted in the principle that a criminal statute must give fair warning of the conduct it criminalizes and protects against judicial enlargement of a criminal statute.  *Heilman*, 456 S.W.3d at 166 (citing *Rogers*, 532 U.S. at 457).

The court's opinion in *Heilman* did not interpret or enlarge a criminal statute, nor did it revive a statute of limitation.  The charge of criminally negligent homicide against Harber was still barred by the statute of limitations when the case was tried in 2017, and Harber could have asserted the defense.  Moreover, *Heilman* was decided more than a year before Harber was tried; he was thus on notice that he was required to invoke the limitations defense.

In both *Proctor* and *Heilman*, the judicial change to the preservation rules announced therein was applied retroactively to increase the procedural burden on the defendant.  And in each case, the Court of Criminal Appeals held retroactive application of the rule announced in the

---

[3] Harber suggests his position is supported by *Carmell v. Texas*, cited for the proposition that retroactive application of a new rule of evidence can be an *ex post facto* violation if it increases the procedural burdens on the defendant.  *See Carmell v. Texas*, 529 U.S. 513 (2000).  However, *Carmell* involved a state statute, not a judicially created rule of evidence.  *See generally id.*  The legislative act reduced the quantum of evidence necessary to support a conviction in a pending case, resulting in an *ex post facto* violation.  *Id.* at 545-46.

decision did not run afoul of the Due Process Clause of the Fifth Amendment. *Heilman*, 456 S.W.3d at 166; *Proctor*, 967 S.W.2d at 845. In *Proctor*, the court explained that its decision "even if applied to appellants, will not deprive them, retroactively, of fair warning of what conduct will give rise to which criminal penalties . . . [and] does not retroactively alter the definition of aggravated robbery as it existed in 1982, its range of punishment, or the substantive defenses that were available with respect to it." *Proctor*, 967 S.W2d at 845. Likewise, applying *Heilman* to Harber does not violate due process. Because Harber failed to raise his statute of limitations defense in the trial court, he forfeited it and is precluded from raising it on appeal.

SUFFICIENCY OF THE EVIDENCE

In his legal insufficiency point, Harber argues the evidence is insufficient to support the conviction for criminally negligent homicide because the State did not prove the alleged acts of criminal negligence created a substantial and unjustifiable risk that Harber failed to perceive and caused Danner's death, and it did not show any seriously blameworthy conduct that was a gross deviation from the ordinary standard of care.

### *The Evidence*

Calvin Brooks testified that on July 27, 2012, he was driving from his home in San Antonio eastbound on Interstate 10 between San Antonio and Seguin when the front driver's side tire on his pickup truck blew out. He pulled over onto the grass past the shoulder on the right side of the highway and called for a tow truck. Brooks testified it was around 5:00 on a hot Friday afternoon and traffic was heavy and "moving pretty fast." At that location, the highway has two lanes going in each direction with a grass median in between. Brooks testified the speed limit was 70 or 75 miles per hour.

When the tow truck arrived, the driver, Travis Danner, had Brooks move his truck back onto the shoulder where the ground was level. Danner parked the tow truck behind Brooks, at an

- 6 -

angle to the highway, with the front of the tow truck pointing toward the road. According to Brooks, this left room for Danner to work on the tire and walk between the vehicles without being in danger of stepping into the traffic lane. Brooks testified Danner left his emergency lights flashing and worked on the tire for five or ten minutes.

Brooks testified that after Danner finished working on the tire, he started putting his tools away in an outer compartment on the driver's side of the tow truck, just behind the cab. Brooks testified that at that time, Brooks had walked away from the highway onto the grass with his back to the road. He heard a crash, and when he turned around, he saw the tow truck had been hit by Harber's truck and saw Harber's truck hit the back of Brooks's truck. Brooks testified Harber's truck continued moving forward and then crossed left across the highway and went into the center median where it "exploded." Brooks said he saw the driver jump out of the truck and roll around in the grass. Brooks then turned back and saw Danner on the ground. His clothes had been torn off him and he was unresponsive.

Although several people stopped at the scene of the accident, the Bexar County Sheriff's Department identified only one person who saw the accident happen. Scott Candella testified he was driving east on I-10 in the right lane with his wife and three children when the accident occurred. Candella gave a statement to one of the deputies at the scene, stating, "I think it was sideswiped, not sure exactly how it was hit." At trial, Candella testified:

> Q. When you were driving on I-10, do you remember what lane of traffic you were driving in?
> A. I was in the right lane.
> Q. In the right lane. How many lanes of traffic were there in total, do you remember?
> A. Two lanes.
> Q. So there was a fast lane/left lane, and a slow lane/right lane?
> A. Yes, sir.
> Q. While you were driving in the right lane of travel on I-10, what did you see?
> A. I was driving. I saw the vehicle come across the lanes, hit a vehicle, come straight directly across and come to a stop with the -- in the median at the crossbars.

Q. And I heard you say it came across the lanes.

A. Yes, sir.

Q. What lane of travel was that first vehicle that ran into those other vehicles, what lane of travel was that first vehicle in?

A. The left lane.

Q. Was in the left lane?

A. Well, he came from this way (indicating), I assume left lane.

Q. So you're assuming, but he came from your left side to your right side?

A. Yes, he crossed. Yes, sir.

Q. And how far in front of you did this happen?

A. It was fairly close. I believe there was one car in front of me and then that happened.

Q. The vehicle that you said came across the lanes, was it a big vehicle or a small vehicle?

A. Big vehicle.

Q. What did you see happen once it came across in front of you? What happened next?

A. It came across. It hit another vehicle. It came directly across the Interstate and came to rest when it hit the median in the -- the crossbars in the median. At that point, I was just focused on straight ahead. There was debris flying and I didn't want to get into another accident, so...

Q. Were you surprised when you saw this happen?

A. Yes, sir.

Q. How fast would you say you were traveling or what was the traffic like when this happened?

A. I'm not sure exactly how fast we were going, but traffic was flowing. We were flowing fine.

Candella testified he drove past the accident and then pulled off the road and called 911. His wife, who is a registered nurse, went to the man who had been hit and started CPR. However, the man died at the scene. The medical examiner later testified that Danner died of multiple blunt force injuries consistent with having been struck by a vehicle at high speed.

Bexar County Sheriff's Department Deputy John Lopez was the first officer at the scene, arriving after the paramedics and fire truck. Deputy Lopez testified Harber identified himself as the driver of the mobile home hauler that caused the accident and asked the deputy about the tow truck driver. Deputy Lopez testified that when he told Harber the driver had died, Harber dropped his head and started crying and said, "I only looked down for a second and then I felt the hit. And then I realized that my truck was on fire and I pulled it over." Harber was later interviewed at the

scene by Bexar County Sheriff's office investigator John Turak. Investigator Turak's interview was recorded on the dashboard camera of one of the county vehicles, and the recording was introduced into evidence and played for the jury.

In the recorded interview, Harber stated he had a Class A commercial driver's license and had been driving big trucks for about ten years. He told Turak he slept five or six hours the night before and had not consumed any alcohol or taken any prescription medicine or other drugs. He stated he had eaten breakfast that morning. He affirmed the brakes on the truck were fine, the truck did not have any mechanical issues, and he did not have any medical issues.

Harber further stated he was driving the mobile home hauler for his employer from Corpus Christi to Cedar Creek. He said he was driving east on I-10 in the right lane, and he saw the tow truck on the shoulder as he "came up over the hill."[4] Harber told Investigator Turak he saw the driver with a reflective vest on, squatting down by the tow truck and looking back toward the traffic. He said he did not see the other pickup truck parked in front of the tow truck. Harber said traffic was heavy and that he and the other vehicles all slowed down to forty or forty-five miles per hour. He told Turak that after seeing the tow truck and driver, he looked to his left to try to change lanes, but a small car in the left lane was crowding him and he could not move over. He stated, "I looked down for a second, but they were crowding me; I couldn't get over there," and as he was passing the tow truck he "felt something hit." Harber told Turak several times that he did not know how or why he drifted onto the shoulder.

The State also introduced a written statement Harber gave an insurance company about a month after the accident. In that statement, he explained the accident as follows:

> Traffic was kinda heavy. But it wasn't bumper to bumper. As I came to the tow truck, I looked to the left to see if I could move over to give the tow truck more room. There was a car there in the fast lane. I was in the slow lane. To the best of

---

[4] There is no evidence in the record of how far "the hill" was from where the tow truck was stopped.

my knowledge, when I looked over to the left this [sic] when I collided with the tow truck. I don't know how or why I managed to hit the tow truck. All I can remember is when I hit the tow truck the truck I was driving caught fire between the cab and the bed.

Harber did not testify at the guilt/innocence stage of the trial.

The State admitted numerous photographs and presented the testimony of Bexar County Sheriff's Deputy Miguel Avila, who initially investigated the crash at the scene, and Investigator Turak, the State's expert crash reconstructionist. Both Investigator Turak and Deputy Avila created diagrams that showed the relative locations of the vehicles and the path Harber's truck took, and these diagrams were introduced into evidence. Both diagrams show Harber's truck beginning in the right lane and then veering off the roadway partly onto the right shoulder, where it hit Danner and the tow truck and then hit Brooks's truck. The diagrams show Harber then continued straight, driving partly in the right lane and partly on the shoulder, before he veered diagonally to the left, crossed both lanes, and drove into the center median, where he came to a stop. Both Deputy Avila and Investigator Turak testified they saw no indication Harber was impaired and neither conducted a field sobriety test. The witnesses testified that driving with an invalid license, driving without a commercial driver's license when one is required, failing to maintain a single lane, and unexcused driving on the shoulder are all crimes. They also explained the Texas law that requires drivers to either move to the lane to the left or reduce speed to twenty miles per hour below the speed limit when there is an emergency vehicle or tow truck with its emergency lights activated on the right shoulder.

Investigator Turak testified he took measurements and examined the skid marks, gouges, and rolling tire marks on the roadway. He determined the initial impact occurred just to the right of the fog line and rumble strip on the right shoulder. Before the accident, the tow truck had been parked at an angle to the road, with the front of the truck pointing to the road. Detective Avila

testified Harber hit the front of the driver's side of the tow truck. This was the area where Brooks had testified Danner was putting away his tools. The impact severely damaged the front of the tow truck and pushed the tow truck onto the grass to the right of the shoulder. Turak testified that when the tow truck was hit and pushed to the side, the front driver's side tire of the tow truck left a mark on the road. That mark showed that prior to the collision, the front of the tire was adjacent to the rumble strip, leaving a small space between the front left corner of the tow truck and the lane of travel.

Investigator Turak testified he took measurements and made calculations to estimate the speed at which Harber was driving at the time of the accident. In his opinion, Harber was driving at least 67 miles per hour at the point of impact. Turak also testified he did not see skid marks on the road that would show Harber slowed down before the collision. However, he acknowledged on cross-examination that skid marks are made when the truck's brakes become locked up and that normal slowing of the truck would not have produced any marks. Investigator Turak testified the speed limit was either 70 or 75, but he did not ascertain which. He did not try to determine the distance from which Harber should have been able to see the tow truck, did not determine how much Harber's truck weighed, and did not try to calculate how long it would have taken for Harber to reduce his speed by twenty miles per hour without locking up the brakes. However, Turak ultimately testified it did not matter how fast Harber was driving or how much he slowed down because "it is still a crime" to hit someone on the shoulder no matter how slow you are driving.

Accident reconstructionist Ricardo Javier Palacios testified for the defense. Palacios explained that Turak misinterpreted some of the marks on the road, failed to take sufficient measurements, and miscalculated Harber's speed as a result. He testified that due to the time that had elapsed since the accident, he had to rely on Turak's incomplete data and it was impossible to do a complete reconstruction. However, he used the photographs and Turak's measurements to

reach some conclusions. Palacios demonstrated what he testified were Turak's faulty assumptions and explained how the assumptions in Turak's calculation should be changed. Palacios then calculated Harber's speed at the time of the collision to have been between 33 and 45 miles per hour. He also testified the ordinary slowing of the truck would not have left skid marks.

Palacios testified Harber told him he had been driving in the right lane, saw the tow truck, and slowed to 40 or 45 miles per hour. He looked left to try to change lanes, but there was a car in the lane. In Palacios's opinion, Harber was looking left, trying unsuccessfully to move to the left lane, and unconsciously overcompensated by turning the steering wheel slightly to the right, causing his vehicle to drift onto the shoulder where he hit the tow truck and driver. Palacios testified it would take an ordinary person driving a heavy truck about two seconds to react to the impact and begin to lock up the brakes. By that time, Harber had hit and passed both trucks. Palacios explained how the tire and gouge marks shown in the photographs were consistent with the accident having occurred this way.

The State also called a witness who identified Harber's Texas Department of Public Safety driving record. Selected pages of the redacted record were introduced into evidence. The witness testified that on the day of the accident, Harber's license was suspended and Harber had been notified in writing his license was suspended. One of the exhibits reflects Harber had a Class C driver's license last issued in January 2010 and the license was suspended on May 15, 2012. The other exhibit included a redacted copy of a May 20, 2012 notice sent to Harber stating his "driver license . . . to operate any motor vehicle has been suspended" and advising he was required to surrender any commercial driver's license to the Department of Public Safety for the period of the suspension. The admitted exhibits were heavily redacted and incomplete and did not reflect

whether Harber had previously been issued a commercial driver's license. Nor did the sponsoring witness testify about whether Harber had ever been issued a commercial driver's license.[5]

### *Standard of Review*

In reviewing the sufficiency of the evidence, we view the evidence "in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony, and we may not substitute our own judgment for that of the jury. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). "Under this standard, evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt." *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017).

### *Criminal Negligence*

A legally sufficient showing of criminally negligent homicide requires the State to prove that: (1) defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that the conduct created a substantial and unjustifiable risk of death; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under similar circumstances. *Id.* at 622 (citing TEX. PENAL CODE §§ 6.03(d),

---

[5] Information regarding the reason for the suspension was redacted from the documents. The unredacted documents, introduced at the punishment phase, reflect the suspension was due to failing to pay surcharges for not having insurance. The unredacted documents further suggest Harber had held a commercial driver's license.

19.05(a)).  The circumstances must be viewed from the standpoint of the defendant at the time of the allegedly criminally negligent conduct.  *Id.* at 623.

Criminal negligence is not simply the criminalization of ordinary civil negligence. *Id.*  The "carelessness required for criminal negligence is significantly higher than that for civil negligence" and the conduct "involves a greater risk of harm to others, without any compensating social utility" than does conduct that constitutes ordinary civil negligence.  *Id.* (quoting *Montgomery*, 369 S.W.3d at 193).  For conduct to constitute criminal negligence, it must be "egregious" and there must be some "serious blameworthiness" attached to the conduct.  *Id.* at 629, 630.  The risk created by the conduct must be "substantial and unjustifiable," and we determine whether the conduct involves such an extreme degree of risk by examining the conduct itself, not the resultant harm. *Id.* at 623.  Finally, the defendant's "failure to perceive the risk must be a 'gross deviation' from reasonable care as judged by general societal standards by ordinary people."  *Id.* at 623 (quoting *Montgomery*, 369 S.W.3d at 193).

In the context of a fatal traffic accident, proof of driving errors that may violate traffic laws or constitute ordinary civil negligence may be insufficient to meet the State's burden.  *See id.* at 630.  To prove a "gross deviation" from the standard of ordinary care in driving, the evidence must support a reasonable inference that appellant engaged in driving acts "more extreme, aggressive, or foolish . . . than are ordinarily engaged in by drivers and accepted as reasonable risks in exchange for the social utility provided."  *Id.* at 630-31.

### DISCUSSION

The indictment and jury charge alleged Harber caused Danner's death with criminal negligence by driving a commercial vehicle without a valid driver's license or a valid commercial driver's license, failing to apply his brakes in a timely and reasonable manner, or by failing to maintain a single lane of traffic and driving on the improved shoulder.  We review the evidence in

the light most favorable to the verdict to determine whether the State established the alleged conduct was criminally negligent and caused Danner's death. *See id.* at 622.

The State presented evidence that on the day of the accident, Harber's driver's license was suspended and Harber had been required to surrender any commercial driver's license for the period of suspension. The evidence thus establishes Harber committed a traffic violation. However, the State was required to prove more than just a traffic violation; to constitute criminal negligence, the conduct must involve an extreme, substantial, and unjustifiable degree of risk. *Id.* at 623. In his taped interview with Turak, Harber stated he had been driving commercial trucks for ten years and had been issued a commercial driver's license. Although the jury was free to disbelieve Harber's statements, the State did not present any evidence to contradict Harber. Nor did the State present any evidence that the suspension of Harber's license was due to unsafe driving or that Harber lacked the knowledge, training, or experience necessary to safely drive the mobile home hauler. And, although the evidence was undisputed that the traffic on the highway that Friday afternoon was heavy, the State did not present any witness who testified Harber was driving erratically or appeared to have any difficulty driving the truck prior to the accident.

We determine whether conduct involves "an extreme degree of risk" by looking at the conduct itself, not the resultant harm. *Id.* at 623. In the absence of any evidence from which it could be reasonably inferred that Harber lacked the skill, training, or experience to safely drive the mobile home hauler, there is nothing in the record to support a finding that Harber's operating the hauler with a suspended license or without a valid commercial driver's license created a substantial and unjustifiable risk. To so conclude "would require speculation beyond what is shown by the evidence or what could be rationally inferred from the evidence in the record." *See id.* at 625.

The next alleged act of criminal negligence was that Harber caused Danner's death by failing to apply the brakes in a timely or reasonable manner. The State contends Harber, driving

in the lane adjacent to the shoulder, was required to slow to twenty miles below the posted speed limit after he saw the tow truck on the shoulder. *See* TEX. TRANSP. CODE § 545.157. It argues Harber's failure to slow to 50 miles per hour after he saw the tow truck is sufficient evidence that Harber did not timely and reasonably apply his brakes. It further argues the jury could have found Harber was excessively speeding by driving at least 67 miles per hour, 17 miles per hour above what was allowed by law, and this sufficiently supports the finding of criminal negligence.

Viewing the evidence in the light most favorable to the verdict, the jury could have found the speed limit was 70 miles per hour and Harber was driving 67 at the time of the accident. In addition, Turak testified there were no skid marks on the road before the point of impact, indicating Harber had not locked up his brakes. The only evidence Harber had slowed the truck before the impact was his own testimony that he and the surrounding traffic slowed to 40 or 45 miles per hour and his expert's testimony that Harber was driving between 33 and 45 miles per hour. But, the jury could have disbelieved Harber and Palacios and could have reasonably inferred from the evidence presented that Harber slowed only to 67 miles per hour after seeing the tow truck driver. This evidence alone does not support an inference that Harber untimely or unreasonably applied his brakes, that his failure to slow to 50 miles per hour was a gross deviation from the ordinary person standard, or that Danner's death was caused by Harber driving 67 miles per hour instead of 50 at the point of impact.

The record establishes the traffic at 5:00 p.m. on a Friday was heavy and flowing. There is no suggestion in the record that Harber at any time was driving faster than the surrounding traffic. There was no evidence of how fast Harber was going before he saw the tow truck. There was also no evidence of the distance between where Harber first saw the tow truck on the shoulder and the point of impact or of how much Harber safely could have reduced his speed over that distance in heavy traffic. And there is no evidence that "locking up" the brakes when Harber first

saw the tow truck would have been reasonable or safe in the heavy traffic. On this record, it would be speculative to conclude Harber did not timely and reasonably apply his brakes.

Even if one could reasonably infer from the evidence that Harber could have further slowed his vehicle, there was no evidence of a "gross deviation" from the ordinary man standard in that there was no evidence he was driving any faster than anyone else in the heavy, flowing traffic at the time of the accident. The State did not attempt to link the speed at which Harber was driving to his ability to maneuver the truck or stay in his lane. Finally, there is no evidence that further reducing his speed, short of stopping the truck, would have prevented Danner's death. That is, there is no evidence the crash would have been any less deadly had it occurred at 50 miles per hour instead of at 67, and any finding that Danner's death was caused by Harber's failure to further reduce his speed would require speculation beyond what could be rationally inferred from the evidence in the record. *See Queeman*, 520 S.W.3d at 625.

The final acts of alleged criminal negligence were that Harber failed to maintain a single lane of traffic and drove on the improved shoulder. The State initially told the jury in its opening statement that failing to maintain a single lane of traffic was essentially the same act as driving on the shoulder: "And we're also going to prove to you, and obviously you know this, that he was not maintaining a single lane of travel because he drove from the lanes of traffic into the shoulder." However, based on Candella's testimony, the State argued to the jury and argues on appeal that Harber was criminally negligent by making an unsafe lane change in violation of section 545.060(a)(2) of the Texas Transportation Code.[6]

---

[6] Section 545.060(a)(2) provides a driver "may not move from the lane unless that movement may be made safely." TEX. TRANSP. CODE § 545.060(a)(2). Neither the indictment nor the jury charge alleged Harber made an unsafe lane change. Rather, they alleged Harber was criminally negligent in "failing to maintain a single lane of traffic" as required by section 545.060(a)(1) (driver "shall drive as nearly as practical entirely within a single lane").

The State asserts in its brief Harber made an unsafe lane change because he made a "sudden," "abrupt" "swerve" from the left lane into the right lane in heavy traffic. Candella testified he saw a large vehicle, several vehicles in front of him, "cross the lanes" from Candella's left side to his right side. Candella assumed Harber had started in the left lane. Candella did not testify the assumed lane change was sudden or abrupt, whether the vehicle had its blinker activated, or that there was not room in the right lane to make the lane change safely. Viewing the evidence in the proper light, the jury could have disbelieved Harber's statement that he was driving in the right lane, looked to the left in an attempt to move to the left, but was crowded out by the heavy traffic. The jury could instead have reasonably concluded from Candella's testimony Harber made a lane change from the left lane to the right lane. However, we do not agree the jury reasonably could have concluded the lane change was "sudden," "abrupt," or a "swerve." Candella did not use those or similar words; he merely described seeing what he assumed to be a lane change by a large vehicle several vehicles in front of him. Candella saw the large vehicle hit the tow truck after the lane change, but he did not know how or why the collision occurred. There was nothing in Candella's testimony from which the jury could infer the lane change itself was unsafe and there was no evidence from any other source that Harber had been driving aggressively or erratically during or before the lane change. Assuming the indictment authorized a finding of criminal negligence based on an unsafe lane change, we conclude the State failed to produce more than a modicum of evidence Harber made an unsafe lane change. *See Queeman*, 520 S.W.3d at 622.

We agree with the State the evidence supports a finding that Harber, while driving in the right lane, failed to maintain a single lane of traffic and drove on the improved shoulder, which caused him to hit Danner, resulting in Danner's death. The only explanations for why Harber drove onto the shoulder were his own statements that he "looked down for a second" and his expert's hypothesis that when Harber was in the right lane, looking left and trying to move lanes,

he unconsciously overcompensated by moving the steering wheel to the right. While the jury could have disbelieved Harber and Palacios, the State did not offer any other explanation. And there is no evidence the size of the truck, the speed at which Harber was driving, the lane change, or a suspended driver's license caused or contributed to Harber driving onto the shoulder. The only evidence in the record is that Harber veered onto the shoulder because he was momentarily inattentive, and there is no evidence of the reason for the inattention other than Palacios's theory.

The State contends this case is analogous to *Montgomery*, in which a driver's inattentiveness and unsafe lane change was held to be criminally negligent. 369 S.W.3d at 196. The evidence showed Montgomery was driving in the middle lane of a highway access road, driving slower than the surrounding traffic, and talking on her cell phone. *Id.* at 191, 194. When she hung up, she realized she had driven past the entrance to the highway ramp she wanted to use. *Id.* She abruptly swerved into the left lane, intending to cut across the "safety barrier" (the solid white line between the entrance ramp and the access road) and enter the highway. *Id.* She did so without looking for oncoming traffic or signaling, and she cut off a driver in the left lane, causing him to strike her vehicle. *Id.* Montgomery's vehicle spun and struck a truck that was driving on the entrance ramp. *Id.* A passenger in that truck died as a result. *Id.* The Court of Criminal Appeals held the evidence supported a finding that Montgomery failed to perceive the substantial and unjustifiable risk created by her "aggressive" lane change, made without signaling or checking for traffic. *Id.* at 194. The court further held the jury could have reasonably found the conduct, which was due in part to being distracted by using a cell phone, was a gross deviation from the ordinary standard of care. *Id.* at 194-95. The court concluded the evidence was legally sufficient to support the verdict of guilty of criminally negligent homicide. *Id.* at 196.

Harber argues the evidence in this case is more akin to *Queeman*. Queeman was driving a van on a two-lane highway when he rear-ended an SUV that was making a left turn off the highway

onto an intersecting street. 520 S.W.3d at 619. The collision resulted in the death of one of the passengers in the SUV, and a jury found Queeman guilty of criminally negligent homicide. *Id.* In reviewing the evidence for legal sufficiency, the Texas Court of Criminal Appeals first concluded the State proved Queeman was speeding and did not brake until the point of impact, and therefore proved Queeman was negligent in failing to maintain control of his vehicle's speed and failing to maintain a proper distance. *Id.* at 624. Although the jury could reasonably infer Queeman was speeding, the court held the State did not prove the speed was excessive. *Id.* at 625. Moreover, the State did not offer any evidence as to whether a collision at or below the speed limit would have caused the same result. *Id.* The court held the jury could have reasonably inferred from the evidence that Queeman did not see the SUV before he hit it and the collision was the result of his inattention. *Id.* at 626. However, there was nothing in the record about the length of or reasons for Queeman's inattention—that is, whether the inattention was ordinary or gross. *Id.*

The court distinguished *Montgomery*, finding there were no "circumstances suggesting [Queeman] was engaging in any activity while driving that a reasonable person would know might distract him" and no evidence Queeman engaged in an inherently unsafe driving maneuver such as a late lane change without signaling, tailgating unreasonably close, or driving aggressively. *Id.* at 628. Because there was "nothing in the record to show that appellant was engaged in acts that might be characterized as grossly negligent in the context of his failure to control speed and failure to maintain a safe distance, such as talking on a cell phone, texting, or intoxication," Queeman's unexplained inattention failed to show a gross deviation from the usual standard of care in driving. *Id.* at 630.

We conclude Harber's conduct is more akin to that in *Queeman*. There is no evidence Harber was engaged in any distracting activity and no evidence the accident was caused by any inherently unsafe driving maneuver. *See id.* at 628. As in *Queeman*, "although the record supports

a rational conclusion that appellant was inattentive long enough for him to [veer onto the shoulder and] collide with [Danner], nothing in the record demonstrates whether this was ordinary or gross inattentiveness that contributed to the collision." *Id.* at 626.

The State asserts that when a tow truck with its lights flashing is stopped on the shoulder, anything short of 100% attention is necessarily a gross deviation from the ordinary standard of care. We agree every driver's goal should be to keep his eyes on the road at all times, especially when there is an upcoming hazard. However, it is unreasonable to expect any driver can or will be 100% attentive, and we decline to hold that the failure to maintain 100% attention, alone, is a gross deviation from the ordinary care standard. Brief inattention while driving may be careless and civilly negligent conduct, but in the absence of evidence of lengthy inattention or evidence of "egregious" or "seriously blameworthy" conduct that caused the inattention, it does not rise to the level of a gross deviation from the ordinary standard of care and does not constitute criminally negligent homicide. *See id.* at 629-30. "Tragic consequences, as here, do not elevate ordinary negligence to criminal negligence." *Id.* at 630.

We hold the evidence is sufficient to show carelessness, but does not establish Harber engaged in any criminally culpable risk-creating conduct that posed a substantial and unjustifiable risk of death and that his failure to perceive that risk was a gross deviation from reasonable care under the circumstances. We conclude the evidence is legally insufficient to establish criminally negligent homicide, and we therefore reverse the trial court's judgment and render a judgment of acquittal.

Luz Elena D. Chapa, Justice

PUBLISH